## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ALASKA COMMUNITY ACTION ON TOXICS, BREAST CANCER
PREVENTION PARTNERS, CENTER FOR ENVIRONMENTAL HEALTH,
CENTER FOR FOOD SAFETY, CENTER FOR SCIENCE IN THE PUBLIC
INTEREST, DEFEND OUR HEALTH, ENVIRONMENTAL DEFENSE FUND,
and LEARNING DISABILITIES ASSOCIATION OF ILLINOIS,
*Petitioners*,

v.

UNITED STATES FOOD AND DRUG ADMINISTRATION and DR. MARTIN
MAKARY, in his official capacity as Commissioner of the United States Food and
Drug Administration,
*Respondents.*

On Petition for Review of a Final Order of the Food and Drug Administration,
89 Fed. Reg. 86,290 (Oct. 30, 2024)

## PROOF BRIEF OF PETITIONERS

Dated: March 28, 2025

KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, Maine 04116
(212) 284-8036
kobrien@earthjustice.org               *(Additional counsel listed on next page)*

LAKENDRA S. BARAJAS
KELLY E. LESTER
Earthjustice
48 Wall St., Floor 15
New York, New York 10005
(212) 284-8025
(332) 251-0243
lbarajas@earthjustice.org
klester@earthjustice.org

*Counsel for Petitioners*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), Petitioners Alaska Community Action on Toxics, Breast Cancer Prevention Partners, Center for Environmental Health, Center for Food Safety, Center for Science in the Public Interest, Defend Our Health, Environmental Defense Fund, and Learning Disabilities Association of Illinois (collectively, "Petitioners") submit the following Certificate as to Parties, Rulings, and Related Cases.

### A.    Parties and Amici

Petitioners in this proceeding are Alaska Community Action on Toxics, Breast Cancer Prevention Partners, Center for Environmental Health, Center for Food Safety, Center for Science in the Public Interest, Defend Our Health, Environmental Defense Fund, and Learning Disabilities Association of Illinois.

Respondents in this proceeding are the United States Food and Drug Administration ("FDA") and its Commissioner, Dr. Martin Makary.[1]

### B.    Ruling Under Review

Petitioners petition for review of, and request that the Court set aside, FDA's October 30, 2024, decision denying Petitioners' administrative objections and

---

[1] Per Federal Rule of Appellate Procedure 43(c), Commissioner Makary is automatically substituted for his predecessor.

hearing requests concerning FDA's denial of Food Additive Petition 6B4815, which requested revocation of FDA regulations authorizing the use of chemicals known as phthalates as additives in food-contact materials. *See* Env't Def. Fund, et al.; Response to Objections and Requests for a Public Hearing, 89 Fed. Reg. 86,290 (Oct. 30, 2024).

## C. Related Cases

This case has not previously been before this Court or any other court. Petitioners are not aware of any other cases challenging the FDA decision at issue in this proceeding.

Dated: March 28, 2025

Respectfully submitted,

*/s/Katherine K. O'Brien*
KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, Maine 04116
(212) 284-8036
kobrien@earthjustice.org

LAKENDRA S. BARAJAS
KELLY E. LESTER
Earthjustice
48 Wall St., Floor 15
New York, New York 10005
(212) 284-8025
(332) 251-0243
lbarajas@earthjustice.org
klester@earthjustice.org

*Counsel for Petitioners*

# RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioners state that they are non-profit organizations. They each have no parent corporations and no publicly held corporation owns a 10 percent or greater ownership interest in any of the organizations.

*/s/Katherine K. O'Brien*
KATHERINE K. O'BRIEN

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.............. iii

RULE 26.1 DISCLOSURE STATEMENT ........................................v

TABLE OF CONTENTS ........................................................ vi

TABLE OF AUTHORITIES.................................................... ix

GLOSSARY ................................................................... xiv

INTRODUCTION ..............................................................1

STATEMENT OF JURISDICTION ...........................................2

STATEMENT OF ISSUES ....................................................3

STATUTES AND REGULATIONS ...........................................3

STATEMENT OF THE CASE.................................................3

I.    PHTHALATES ..........................................................3

II.   FDA'S AUTHORIZATIONS FOR FOOD-CONTACT USE OF
      PHTHALATES BASED ON HALF-CENTURY-OLD SCIENCE ...............5

III.  FDA'S DUTY TO ENSURE FOOD ADDITIVES ARE SAFE.....................7

      A.   The Safety Standard for Food Additives .................................7

      B.   Petitions for Adoption or Revocation of Food-Additive
           Authorizations...........................................................9

IV.   FDA'S DECISION TO MAINTAIN ITS DECADES-OLD
      AUTHORIZATIONS FOR PHTHALATE ADDITIVES WITHOUT
      AFFIRMING THEIR SAFETY ..................................................10

      A.   The 2016 Food Additive Petition............................................10

      B.   FDA's 2022 Decisions on Phthalates in Food-Contact Materials .........13

C.    Petitioners' Objections to the 2022 Petition Denial..............................15

D.    FDA's 2024 Order Denying Petitioners' Objections ............................17

SUMMARY OF ARGUMENT.................................................................17

STANDING..............................................................................................19

ARGUMENT ...........................................................................................22

I.      STANDARD OF REVIEW .........................................................22

II.    FDA UNLAWFULLY PLACED ON PETITIONERS THE BURDEN OF PROVING THAT THE PHTHALATE ADDITIVES ARE HARMFUL......23

A.    FDA's Approach Contravenes the Food Act...........................24

B.    FDA's Approach Contravenes Its Regulations ......................27

C.    FDA's Approach Is Inconsistent with Past Practice..............29

D.    FDA Failed to Determine Whether the Phthalate Additives Are Safe...31

III.   FDA ARBITRARILY REJECTED EVIDENCE THAT RAISES SIGNIFICANT QUESTIONS ABOUT THE PHTHALATE ADDITIVES' SAFETY ...............................................................................................34

A.    FDA Irrationally Disregarded Decades of New Toxicity Evidence ......34

1.    Petitioners submitted extensive evidence post-dating FDA's approvals linking the Phthalate Additives to serious health harms.35

2.    FDA irrationally discounted Petitioners' toxicity evidence ...........37

B.    FDA Irrationally Disregarded Evidence of Unsafe Exposures.............43

1.    FDA's position has no basis in the statute or regulations...............44

2.    FDA's dismissal of the exposure evidence is irrational .................45

C.    FDA Irrationally Disregarded the Cumulative Effect of Multiple Phthalates That Cause the Same Health Harms.....................................51

        1.    FDA must consider the cumulative effect of related phthalates in food ...............................................................................51

        2.    FDA unlawfully disregarded the cumulative effect of dietary exposure to the related phthalates DEHP, DINP, DCHP, and DIOP ................................................................................52

IV.     FDA UNLAWFULLY DENIED PETITIONERS' HEARING REQUEST ...........................................................................56

    A.    The Food Act Mandates Hearings to Resolve Material Factual Disputes Raised by Objections ...........................................................56

    B.    The Objections Raise Material Factual Issues Justifying a Hearing .....57

V.      REMEDY .........................................................................60

CONCLUSION .........................................................................61

CERTIFICATE OF COMPLIANCE .........................................62

CERTIFICATE OF SERVICE ................................................63

# TABLE OF AUTHORITIES

## Cases

*Cal. Cmtys. Against Toxics v. EPA*,
    928 F.3d 1041 (D.C. Cir. 2019) .......................................................................41

*Cigar Ass'n of Am. v. FDA*,
    126 F.4th 699 (D.C. Cir. 2025), *amended by*
    No. 23-5220, 2025 WL 913477 (D.C. Cir. Mar. 26, 2025) ......................... 43, 56

*Cmty. Nutrition Inst. v. Young*,
    773 F.2d 1356 (D.C. Cir. 1985) .......................................................................56

*Competitive Enter. Inst. v. NHTSA*,
    901 F.2d 107 (D.C. Cir. 1990) .........................................................................21

*Ctr. for Sustainable Econ. v. Jewell*,
    779 F.3d 588 (D.C. Cir. 2015) .........................................................................22

*Dickson v. Sec'y of Def.*,
    68 F.3d 1396 (D.C. Cir. 1995) .........................................................................22

*Env't Health Tr. v. FCC*,
    9 F.4th 893 (D.C. Cir. 2021) ...........................................................................39

*Erwin v. FAA*,
    23 F.4th 999 (D.C. Cir. 2022) .........................................................................21

*Flyers Rights Educ. Fund v. U.S. Dep't of Transp.*,
    957 F.3d 1359 (D.C. Cir. 2020) .......................................................................19

*Fmali Herb, Inc. v. Heckler*,
    715 F.2d 1385 (9th Cir. 1983)..........................................................................26

*Hynson, Westcott & Dunning, Inc. v. Richardson*,
    461 F.2d 215 (4th Cir. 1972), *aff'd, sub. nom.*
    *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609 (1973)...... 57, 59

*In re Am. Rivers & Idaho Rivers United*,
    372 F.3d 413 (D.C. Cir. 2004) .........................................................................33

*In re Nat. Res. Def. Council*,
    645 F.3d 400 (D.C. Cir. 2011)................................................................9

*League of United Latin Am. Citizens v. Regan*,
    996 F.3d 673 (9th Cir. 2021)......................................................... 28, 29

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)........................................................................ 23, 27

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)...............................................................................21

*MCI Telecomms. Corp. v. FCC*,
    627 F.2d 322 (D.C. Cir. 1980) ............................................................60

*Mississippi v. EPA*,
    744 F.3d 1334 (D.C. Cir. 2013) .................................................... 42, 47

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983)..........................................................22, 51, 55-56

*Nader v. EPA*,
    859 F.2d 747 (9th Cir. 1988).............................................................56

*Nat. Res. Def. Council v. FDA*,
    884 F. Supp. 2d 127 (S.D.N.Y. 2012) .......................................... 27-28

*Nat. Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) .............................................................19

*Pharm. Mfg. Rsch. Servs. v. FDA*,
    957 F.3d 254 (D.C. Cir. 2020) ........................................... 56, 57, 58

*POM Wonderful LLC v. Coca-Cola Co.*,
    573 U.S. 102 (2014)...............................................................................7

*PPG Indus. v. United States*,
    52 F.3d 363 (D.C. Cir. 1995) ...................................................... 23, 31

*Pub. Citizen Health Rsch. Grp. v. Brock*,
    823 F.2d 626 (D.C. Cir. 1987) ...........................................................60

*Pub. Citizen Health Rsch. Grp. v. Chao*,
   314 F.3d 143 (3d Cir. 2002) ..................................................................47

*Ramaprakash v. FAA*,
   346 F.3d 1121 (D.C. Cir. 2003) ...................................................... 30, 33

*Sierra Club v. EPA*,
   755 F.3d 968 (D.C. Cir. 2014) ..............................................................20

*Sierra Club v. Jackson*,
   648 F.3d 848 (D.C. Cir. 2011) ..............................................................56

*Teton Historic Aviation Found. v. Dep't of Def.*,
   785 F.3d 719 (D.C. Cir. 2015) ..............................................................21

*United States v. Lexington Mill & Elevator Co.*,
   232 U.S. 399 (1914) ...............................................................................25

**Statutes**

5 U.S.C. § 706(2) .........................................................................................22

15 U.S.C. § 2057c(a) ......................................................................................6

15 U.S.C. § 2057c(b) ......................................................................................6

15 U.S.C. § 2057c(g)(1)(C) ............................................................................6

21 U.S.C. § 321(s) .......................................................................................5, 7

21 U.S.C. § 331 ............................................................................................25

21 U.S.C. § 342(a)(1)....................................................................................25

21 U.S.C. § 348(a) .............................................................................. 7, 32, 33

21 U.S.C. § 348(a)(2) ...................................................................................23

21 U.S.C. § 348(a)(3)......................................................................................7

21 U.S.C. § 348(b) ..........................................................................................2

21 U.S.C. § 348(b)(1) ..............................................................9

21 U.S.C. § 348(c) ...................................................................2

21 U.S.C. § 348(c)(2) ....................................................... 10, 13

21 U.S.C. § 348(c)(3) ....................................................... 32, 33

21 U.S.C. § 348(c)(3)(A) ................... 1, 7, 8, 17, 23, 25, 27, 31

21 U.S.C. § 348(c)(5) ..................................................... 9, 50-51

21 U.S.C. § 348(c)(5)(A) .......................................................44

21 U.S.C. § 348(c)(5)(B) ................................... 51, 52, 53, 55

21 U.S.C. § 348(f) ........................................... 2, 15, 54, 59

21 U.S.C. § 348(f)(1) ...................................... 10, 56, 58

21 U.S.C. § 348(g) ...............................................................3

21 U.S.C. § 348(g)(1) .........................................................10

21 U.S.C. § 348(g)(2) .........................................................54

21 U.S.C. § 348(i) ........................................... 2, 9, 26

21 U.S.C. § 393(b)(2)(A) ...............................................7, 33

**Regulations**

21 C.F.R. § 12.22 ...............................................................54

21 C.F.R. § 12.24(b) ..................................................... 57, 59

21 C.F.R. § 12.24(b)(3) .......................................................59

21 C.F.R. § 12.87(d) ..................................................... 25, 27

21 C.F.R. § 12.100 ...............................................................54

21 C.F.R. § 170.3(e)(1) ...................................................5, 7

21 C.F.R. § 170.3(e)(3) ......................................................7

21 C.F.R. § 170.3(i) ............................................ 8, 23, 25, 27

21 C.F.R. § 170.3(i)(1) ....................................................44

21 C.F.R. § 170.3(i)(2) ....................................................51

21 C.F.R. § 170.18(a) ................................................ 51, 53

21 C.F.R. § 171.1 ..................................................... 9, 30, 44

21 C.F.R. § 171.1(c) ........................................................9

21 C.F.R. § 171.100 ......................................................30

21 C.F.R. § 171.130 .....................................................9, 30

21 C.F.R. § 171.130(b) ................................... 9, 28, 34, 37, 44

21 C.F.R. § 181.1 .........................................................11

21 C.F.R. § 181.5 .........................................................11

21 C.F.R. § 181.27 .......................................................11

40 C.F.R. § 180.32(b) ....................................................29

**Legislative History**

S. Rep. No. 85-2422 (1958) ..................................................8

**Federal Register Notices**

Prohibition of Children's Toys and Child Care Articles Containing Specified
    Phthalates, 82 Fed. Reg. 49,938 (Oct. 27, 2017) .............................. 41, 46, 47, 49

# GLOSSARY

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **ATSDR** | Agency for Toxic Substances and Disease Registry |
| **CDC** | Centers for Disease Control and Prevention |
| **CPSC** | Consumer Product Safety Commission |
| **DAP** | Diallyl phthalate |
| **DCHP** | Dicyclohexyl phthalate |
| **DEHP** | Di-(2-ethylhexyl) phthalate |
| **DIDP** | Diisodecyl phthalate |
| **DINP** | Diisononyl phthalate |
| **DIOP** | Diisooctyl phthalate |
| **EPA** | United States Environmental Protection Agency |
| **Food Additive Petition** | Food additive petition 6B4815 dated March 18, 2016 |
| **FDA** | United States Food and Drug Administration |
| **NHANES** | National Health and Nutrition Examination Survey |
| **Phthalate Additives** | DAP, DCHP, DEHP, DIDP, DINP |
| **Order** | Env't Def. Fund, et al.; Response to Objections and Requests for a Public Hearing, 89 Fed. Reg. 86,290 (Oct. 30, 2024). |

## INTRODUCTION

This case challenges FDA's 2024 decision to maintain its authorizations allowing companies to use toxic chemicals called phthalates in food packaging and food-production materials. The use of phthalates in these food-contact materials contaminates the food supply and causes population-wide exposure to phthalates.

FDA's authorizations rely on safety assessments conducted at least 40 years ago. In the intervening decades, the evidence of phthalates' serious health risks—including their capacity to harm children's brain development and cause life-altering changes in cognition and behavior—has expanded substantially. Despite this evidence, and evidence that food is the primary source of Americans' phthalate exposure, FDA denied Petitioners' petition and related objections seeking revocation of FDA's authorizations for food-contact use of phthalates. FDA did so without updating its decades-old safety assessments and without affirming that the phthalates' continued use "will be safe," as the Federal Food, Drug, and Cosmetic Act ("Food Act") requires. 21 U.S.C. § 348(c)(3)(A).

FDA committed to update its safety assessments for food-additive uses of phthalates 17 years ago, and it presided over an 8-year administrative process to evaluate Petitioners' arguments that modern science does not support FDA's outdated safety findings. Yet FDA still has not done what the law requires: rationally affirm the chemicals' safety or revoke their authorizations.

As explained by Dr. Ami Zota, a leading expert in phthalate exposure and hazards, with every year that phthalates remain in food-contact materials, "more people continue to be exposed to levels of phthalates in their food that are damaging to their health." [FDA-010871]. This includes children, whose ongoing exposure to phthalates in their food is acutely concerning because "[t]he effects of these early-life exposures on health and development can alter a person's entire life trajectory." *Id.*

To address FDA's abdication of its statutory duty to ensure the safety of chemicals in food-contact materials and the resulting harm to people's health, Petitioners seek an order from this Court vacating FDA's denial of Petitioners' objections and directing FDA to take action within 60 days to revoke the disputed authorizations or notice a hearing on Petitioners' objections as the Food Act mandates.

## STATEMENT OF JURISDICTION

FDA had jurisdiction over Petitioners' objections and related petition pursuant to 21 U.S.C. § 348(b)-(c), (f), (i). FDA issued a final decision denying Petitioners' objections and hearing requests on October 30, 2024. [FDA-000001-FDA-000002].

On December 19, 2024, Petitioners timely petitioned for review of FDA's decision under 21 U.S.C. § 348(g), which confers jurisdiction on this Court. Petition for Review, Doc. 2091192.

## STATEMENT OF ISSUES

1.     Whether FDA unlawfully imposed on Petitioners the burden of proving that the phthalate additives are harmful.

2.     Whether FDA arbitrarily rejected evidence of the phthalate additives' toxicity that supports significant questions about their safety.

3.     Whether FDA arbitrarily rejected evidence concerning the magnitude of exposure to the phthalate additives that supports significant safety questions.

4.     Whether FDA unlawfully disregarded the cumulative effect of exposure to multiple phthalates that contribute to the same health harms.

5.     Whether FDA unlawfully denied Petitioners' requests for a hearing on their objections.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in the accompanying addendum.

## STATEMENT OF THE CASE

## I.     PHTHALATES

Phthalates are a class of synthetic chemicals used primarily as "plasticizers," which make rigid plastics flexible. [FDA-021101]. Phthalates are used in numerous

products including toys, flooring, personal care products, pharmaceuticals, and food-contact materials. *Id.*[2]

"Because phthalates are not chemically bound to the materials to which they are added," phthalates leach out of these products—either into the surrounding environment or, when used in food-contact materials, into food and beverages. [FDA-010705-FDA-010706] (Declaration of Dr. Russ Hauser). Multiple authoritative assessments have concluded that diet is the primary source of phthalate exposure in the United States. [FDA-013535]; [FDA-010706].

Large-scale biomonitoring studies by the Centers for Disease Control and Prevention ("CDC"), which measure chemical metabolites in human blood and urine, indicate that almost everyone in the United States has multiple phthalates in their body. [FDA-010720]. Further, "[p]hthalates are readily transferred from mother to fetus during pregnancy." [FDA-011907] (Engel et al. 2021).

Leading scientists have declared that this near-ubiquitous exposure presents "an urgent public health issue" given phthalates' serious health risks. [FDA-010722] (Hauser Declaration); *see also* [FDA-010870] (Declaration of Dr. Ami Zota). It is well established that phthalates interfere with fetal testosterone

---

[2] The phthalates at issue here are "ortho-phthalates," the most commonly used category of phthalates. [FDA-011906-FDA-011907]. For simplicity we refer to them as "phthalates."

4

production, leading to penile malformations and other birth defects. [FDA-010717]. Phthalates are also associated with infertility, miscarriage, preterm birth, cancer, and harm to brain development manifesting in behavioral disorders and reduced IQ in children. [FDA-010708-FDA-010714]; [FDA-013535-FDA-013537]; [FDA-012874]; [FDA-010259]; [FDA-000383]. Children and developing fetuses are especially vulnerable to phthalates' effects, and leading scientists have concluded that fetal and early childhood exposure to phthalates puts children at risk of irreversible health harm. [FDA-010714-FDA-010718]; [FDA-011906-FDA-011912].

## II. FDA'S AUTHORIZATIONS FOR FOOD-CONTACT USE OF PHTHALATES BASED ON HALF-CENTURY-OLD SCIENCE

Beginning roughly 60 years ago, FDA approved the use of 28 phthalates as "food additives" in food-contact materials. The chemicals are regulated as food additives because they are known or expected to migrate from food-contact materials into food. 21 U.S.C. § 321(s); 21 C.F.R. § 170.3(e)(1).

The FDA safety assessments supporting these authorizations are based on data provided between 1961-1985, meaning that the evidence justifying FDA's ongoing approval of phthalate use in food-contact materials is, depending on the specific phthalate, *at least 40 years old and, for some phthalates, more than 60 years old.* [FDA-021102]. As discussed *infra*, the evidence of phthalates' health risks has expanded substantially in the intervening decades. This includes new

5

studies identifying health harms from phthalates that were unknown or poorly understood when FDA approved their use and updated exposure data.

Based on the mounting evidence of phthalates' dangers to human health—particularly children's health—more than 15 years ago Congress banned use of three phthalates in toys and childcare articles[3] and directed the Consumer Product Safety Commission ("CPSC") to convene an expert panel to study phthalates' effects on children's health and recommend additional restrictions. 15 U.S.C. § 2057c(a)-(b). In 2014, that expert panel recommended interim or permanent bans on six additional phthalates. [FDA-001381-FDA-001382]. Though the panel's charge was limited to recommending regulations to address phthalate exposure from toys and childcare articles, the experts determined through a comprehensive exposure assessment that "food, beverages, and drugs via direct ingestion, and *not children's toys and their personal care products*, constituted the highest [source of] phthalate exposures" and urged FDA to act. [FDA-001427].

FDA promised to do so 17 years ago. In 2008, FDA established a Phthalate Task Group to "address the potential risks raised in the contemporary [scientific] literature and to ensure that the authorized uses continue to meet the 'reasonable

---

[3] These include products "intended … to facilitate sleep or the feeding of children age 3 and younger, or to help such children with sucking or teething." 15 U.S.C. § 2057c(g)(1)(C).

certainty of no harm' safety standard for food additives." [FDA-013184]. In 2014, FDA assured Congress that it was "conducting the necessary risk assessments," [FDA-013189], and would "take appropriate regulatory action to remove these materials from the marketplace" if the "data no longer support the[ir] continued safe use." [FDA-013185]. More than a decade later, those assessments remain unfinished, and the public continues consuming phthalates in our food based on data and analyses that are roughly a half-century old.

## III. FDA'S DUTY TO ENSURE FOOD ADDITIVES ARE SAFE

### A. The Safety Standard for Food Additives

FDA's intransigence is at odds with its duty under the Food Act to "protect the public health by ensuring that … foods are safe." 21 U.S.C. § 393(b)(2)(A); *see POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 108 (2014) (explaining that the Food Act's primary purpose is "to protect the health and safety of the public at large"). FDA has a statutory duty to ensure the safety of food additives, 21 U.S.C. § 348(a), (c)(3)(A), which include substances added directly to food (such as flavorings and preservatives) as well as indirect food additives, which are used in food packaging and processing materials and are known or "reasonably … expected" to migrate into food, *id.* § 321(s); *see also id.* § 348(a)(3); 21 C.F.R. § 170.3(e)(1), (3).

Congress established an exacting standard for food-additive authorizations to effectuate the Food Act's purpose of ensuring the safety of the food supply. The Act dictates that all additives are presumed unsafe and prohibited unless the evidence before FDA proves "that the proposed use of [a] food additive … will be safe." 21 U.S.C. § 348(c)(3)(A). Under FDA's regulations, an additive is "safe" if the evidence supports a "reasonable certainty in the minds of competent scientists that the substance is not harmful under the conditions of its intended use." 21 C.F.R. § 170.3(i); *see also* S. Rep. No. 85-2422, at 5305 (1958) (explaining that the Act "requires proof of reasonable certainty that *no harm will result* from the proposed use of an additive" (emphasis added) (quotation omitted)); *id.* at 5309-10 (explaining Congress's intent to ensure "that nothing shall be added to the foods [people] eat which can reasonably be expected to produce any type of illness," "disease or disability" in "humans or animals").

To determine whether additives satisfy this stringent safety standard, FDA must consider, "among other relevant factors," (1) "the probable consumption of the additive and of any substance formed in or on food because of the use of the additive"; (2) "the cumulative effect" of consuming the additive in combination with "any chemically or pharmacologically related … substances in [the] diet"; and (3) scientifically accepted "safety factors" to provide an appropriate margin of

safety for human health when FDA is extrapolating from toxicology studies on animals. 21 U.S.C. § 348(c)(5).

**B.     Petitions for Adoption or Revocation of Food-Additive Authorizations**

Any person may file a "food additive petition" asking FDA to issue, amend, or repeal a food-additive authorization. *Id.* § 348(b)(1), (i); 21 C.F.R. §§ 171.1, 171.130. When companies petition FDA to approve additives, "the petitioner bears the burden of showing that the additive … 'will be safe for its intended use.'" *In re Nat. Res. Def. Council*, 645 F.3d 400, 402-03 (D.C. Cir. 2011) (quoting 21 C.F.R. § 171.1(c)).

Petitioners seeking revocation of food-additive authorizations do not bear a comparable burden of proof. Instead, such petitioners must provide

> an assertion of facts, supported by data, showing that new information exists with respect to the food additive or that new uses have been developed or old uses abandoned, that new data are available as to toxicity of the chemical, or that experience with the existing regulation … may justify its amendment or repeal.

21 C.F.R. § 171.130(b). As FDA explained in granting such a petition, it must revoke food-additive authorizations if the evidence raises "significant questions as to the safety of the authorized uses" and there is "a lack of data … to address these questions." [FDA-009083]; *see also* [FDA-002005] (FDA affirming in this proceeding that it must revoke food-additive authorizations when petitioners present "sufficient data to establish the existence of safety questions significant

enough to support a finding that there is no longer a reasonable certainty of no harm from the currently approved uses").

The Food Act requires FDA to issue an order granting or denying food additive petitions within 180 days. 21 U.S.C. § 348(c)(2). Any person adversely affected by FDA's decision may submit "objections" to FDA, which are a prerequisite to judicial review. *Id.* § 348(f)(1), (g)(1). The objections may introduce new evidence. Indeed, the Act mandates that FDA "shall" hold a hearing "for the purpose of receiving evidence relevant and material to the issues raised by [the] objections" "as promptly as possible" and, "[a]s soon as practicable after completion of the hearing, … shall by order act upon such objections and make such order public." *Id.* § 348(f)(1). FDA's order on the objections (but not its initial decision on the petition) is final agency action reviewable in this Court. *Id.* § 348(g)(1).

## IV. FDA'S DECISION TO MAINTAIN ITS DECADES-OLD AUTHORIZATIONS FOR PHTHALATE ADDITIVES WITHOUT AFFIRMING THEIR SAFETY

### A. The 2016 Food Additive Petition

In March 2016, most of the Petitioners and allied organizations filed the petition that initiated this proceeding, asking FDA to revoke its regulations authorizing food-contact use of phthalates and prospectively ban food-contact use

of the phthalates identified as unsafe by CPSC's expert panel.[4] [FDA-012416-012484] ("Food Additive Petition" or "Petition"). Petitioners' revocation requests targeted two categories of regulations: (1) FDA's regulations authorizing use of 28 phthalates as indirect food additives in food-contact materials,[5] and (2) FDA's regulation authorizing certain food-contact uses of five of those phthalates pursuant to "prior sanctions," which are authorizations FDA issued allowing direct or indirect addition of chemicals to food before Congress's 1958 amendments to the Food Act. 21 C.F.R. §§ 181.1, 181.5, 181.27.

FDA accepted the portion of the Petition asking FDA to revoke its regulations authorizing use of 28 phthalates as food additives. [FDA-018562]. But FDA notified Petitioners that they must submit a separate "citizen petition," which is governed by different procedures, to address their requests to revoke FDA's prior sanctions for five phthalates and adopt regulations prospectively prohibiting food-contact use of the phthalates determined to be unsafe for children's products by CPSC's expert panel. *Id*. Petitioners resubmitted those requests in a citizen petition

---

[4] For simplicity, we refer to both the organizations who submitted the 2016 petition and Petitioners before this Court as "Petitioners," as the differences in the specific organizations involved at various stages are immaterial to the issues presented.

[5] The Petition originally addressed 30 chemicals, but Petitioners subsequently narrowed its scope to 28 phthalates. [FDA-018690].

in April 2016. [FDA-018569-FDA-018574]. The citizen petition is not at issue in this proceeding.

The Food Additive Petition presented substantial scientific evidence published in the decades since FDA issued its food-additive authorizations for phthalates documenting the chemicals' health harms and identifying data gaps that add to safety concerns. [FDA-012422-FDA-012423, FDA-012432, FDA-012451-FDA-012468]. Further, going beyond the requirements of the Food Act and FDA's regulations, Petitioners presented an argument that dietary exposure among women and children to the 28 phthalates approved as additives at that time exceeds the level at which health harm may occur. [FDA-012416-FDA-012430, FDA-012432, FDA-012439-FDA-012444, FDA-012451-FDA-012468, FDA-012472]. This argument relied in part on the assertion that the 28 then-approved phthalates are sufficiently similar to treat them as a class for safety assessment, meaning FDA could rely on evidence of health harms associated with the more-studied phthalates to assess the safety of the class and that FDA must consider the cumulative effects of all phthalates in the class. [FDA-012416-FDA-012430, FDA-012432]. In response to FDA's request, Petitioners submitted additional toxicity and exposure data in 2017. [FDA-018690-FDA-018760].

## B.    FDA's 2022 Decisions on Phthalates in Food-Contact Materials

Contrary to FDA's statutory mandate to grant or deny the Food Additive

Petition within six months, 21 U.S.C. § 348(c)(2), it failed to act for more than six

years, forcing Petitioners to petition this Court for a writ of mandamus to compel

FDA's overdue decision. Petition for Writ of Mandamus, *In re Env't Def. Fund et*

*al.*, No. 21-1255 (D.C. Cir. Dec. 7, 2021), Doc. 1926652.

On May 20, 2022, FDA finally acted on the Petition and took three other

actions concerning phthalates in food-contact materials:

First, FDA granted a 2018 petition from a plastics industry trade group to

revoke FDA's food-additive authorizations for 23 of the 28 phthalates addressed in

Petitioners' Food Additive Petition on the basis that industry has "abandoned" use

of those phthalates such that FDA's authorizations are no longer needed. [FDA-

021091-FDA-021100]. That decision substantially altered the regulatory landscape,

leaving five phthalates—instead of 28—approved as food additives: dicyclohexyl

phthalate ("DCHP"), di-(2-ethylhexyl) phthalate ("DEHP"), diisononyl phthalate

("DINP"), diisodecyl phthalate ("DIDP"), and diallyl phthalate ("DAP")

(collectively, the "Phthalate Additives" or the "Additives"). [FDA-000007]. This

does not signify a reduction in phthalate use or exposure; a 2023 study detected

one or more phthalates in 100% of sampled foods, with DEHP detected in 100% of

foods tested, DINP in nearly 25%, and DCHP in roughly 10%. Carey Perez de Alejo Decl. ¶ 11.

Second, FDA denied Petitioners' Food Additive Petition. [FDA-002004-FDA-002017]. Puzzlingly, that decision rested on FDA's assertion that Petitioners failed to prove that the 28 phthalates previously approved as additives harm human health based on their evaluation as a class, ignoring that FDA had mooted Petitioners' arguments concerning class-based assessment of that group of 28, and the safety of 23 of those additives, by granting the industry abandonment petition. [FDA-002013].

Third, FDA denied Petitioners' citizen petition, leaving in place FDA's prior sanctions authorizing food-contact use of five phthalates: butylphthalyl butyl glycolate, diethyl phthalate, ethylphthalyl ethyl glycoate, DEHP, and diisooctyl phthalate ("DIOP"). [FDA-021077-FDA-021090].

Fourth, FDA published a "request for information" concerning phthalates in food-contact materials. [FDA-021101]. There, FDA affirmed that its still-active authorizations for food-contact uses of phthalates are "based on exposure and toxicological information and data provided during the period of 1961 through 1985." [FDA-021102]. FDA stated that it "*may* use [the] information [requested] to update the dietary exposure estimates and safety assessments" for phthalates in the future. *Id.* (emphasis added). FDA did not explain its decision to defer that

potential safety reassessment to an indeterminate future date, instead of conducting it in response to Petitioners' petitions that FDA had been considering for more than six years, or through the assessments initiated by FDA's Phthalate Task Group 17 years ago.

## C. Petitioners' Objections to the 2022 Petition Denial

In June 2022 Petitioners submitted timely objections to FDA's decision denying their Food Additive Petition and requested a hearing. [FDA-009531-FDA-009585]. The objections focused on the safety of the five Phthalate Additives that remain approved, since, as noted, FDA's decision granting the industry abandonment petition mooted Petitioners' arguments about the safety of the 23 phthalates whose authorizations FDA had revoked. [FDA-009533-FDA-009535]. Consistent with the Food Act's provisions governing petition proceedings, which contemplate expanding the record at the objections stage, 21 U.S.C. § 348(f), Petitioners' objections included dozens of scientific studies and analyses concerning the Phthalate Additives' safety that were published since Petitioners last supplemented the Petition record in 2017. *See generally* [FDA-009547-FDA-009585].

Petitioners filed eight objections:

Objections 1 and 2 argued that FDA applied an erroneous legal standard to the Petition, unlawfully placing on Petitioners the burden of proving that the

Phthalate Additives cause harm under their approved conditions of use. [FDA-009538-FDA-009546]. As a result, FDA unlawfully denied the Petition and failed to reassess the Additives' safety, instead deciding to maintain its authorizations for the Additives without updating its decades-old safety assessments. *Id*.

Objection 3 argued that FDA failed to rationally address the substantial body of recent toxicity information Petitioners presented that links the Additives to numerous health harms—including health harms that were not documented in the scientific literature when FDA approved the Additives. [FDA-009547-FDA-009551]. Petitioners requested a hearing on this objection. [FDA-009551-FDA-009552].

Objections 4-6 argued that FDA applied an erroneous interpretation of "chemically or pharmacologically related" substances and, as a result, failed to consider that multiple Phthalate Additives, and additional phthalates found in food, pose cumulative health risks. [FDA-009552-FDA-009570]. Petitioners requested a hearing on whether multiple phthalates approved for food-contact use or otherwise present in food are "chemically or pharmacologically related" such that FDA must consider their cumulative effects in assessing safety. [FDA-009560-FDA-009561, FDA-009564-FDA-009565, FDA-009567-FDA-009570].

Objections 7 and 8 argued that FDA unlawfully required Petitioners to provide evidence that dietary exposure to the Phthalate Additives exceeds safe

levels and irrationally concluded that the exposure evidence Petitioners provided fails to establish significant safety questions. [FDA-009570-FDA-009579]. Petitioners requested a hearing on whether the exposure evidence they presented, in conjunction with other evidence, raises significant safety questions. [FDA-009579].

### D. FDA's 2024 Order Denying Petitioners' Objections

More than two years later, FDA published the order under review, which summarily denied Petitioners' objections without a hearing. [FDA-000001-FDA-000016] (the "Order"). FDA's Order, like its prior petition denial, rests principally on the assertion that Petitioners "failed to provide sufficient support for [their] request to revoke the authorization for the 28 []phthalates that were the subject of the [2016] petition." [FDA-000004]. FDA did not update its safety assessments for the five Phthalate Additives that remain approved nor determine, based on the record before FDA, that their continued use "will be safe." 21 U.S.C. § 348(c)(3)(A).

### SUMMARY OF ARGUMENT

FDA's Order is arbitrary, capricious, and contrary to the Food Act and FDA's regulations.

First, FDA unlawfully imposed on Petitioners the burden of proving that the Phthalate Additives are harmful. That approach contravenes the Food Act, FDA's

regulations, and past FDA practice, which establish that petitioners seeking revocation of food-additive authorizations need only introduce new evidence of the additives' toxicity that raises significant questions about their safety that FDA cannot rationally dispel. *Infra* Point II.

Second, FDA arbitrarily rejected record evidence demonstrating numerous toxic effects of the Phthalate Additives—including effects FDA never considered in approving them—and demonstrating that food is the predominant exposure source. Further, FDA unlawfully failed to consider the cumulative effects of exposure to multiple phthalates that cause the same health harm as part of an assessment of the Additives' safety. Contrary to FDA's conclusions, this evidence supports significant safety questions that FDA failed to rationally address. *Infra* Point III.

Finally, assuming for the sake of argument that FDA was not required to revoke the Phthalate Additives' approvals based on the existing record, FDA unlawfully denied Petitioners a hearing on disputed issues of material fact raised in their objections. *Infra* Point IV.

To remedy FDA's persistent and unlawful refusal to revoke the Additives' approval or rationally affirm their safety, the Court should vacate the Order and direct FDA to, within 60 days, initiate revocation proceedings or notice a hearing. *Infra* Point V.

## STANDING

Petitioners are non-profit organizations dedicated to protecting people from toxic chemicals in food, consumer products, and the environment. They have standing to sue on behalf of their members and supporters, and their children, who suffer harm from FDA's food-additive authorizations for toxic phthalates that would be redressed by a favorable decision from this Court.

Where, as here, an organization sues on its members' behalf, it must show that: (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 76-77 (D.C. Cir. 2020) (quotation omitted); *see Flyers Rights Educ. Fund v. U.S. Dep't of Transp.*, 957 F.3d 1359, 1361-62 (D.C. Cir. 2020) (holding that this standard applies to organizations with functional equivalent of members).

Petitioners' members and supporters would have standing to sue in their own right because they suffer "injury in fact" that is traceable to FDA's decision and likely to be redressed by a favorable judicial decision. *Nat. Res. Def. Council*, 955 F.3d at 76 (quotation omitted). Because of FDA's decision to reject Petitioners' objections and maintain its authorizations for the Phthalate Additives, Petitioners' members and supporters are exposed to the Additives in food, putting them and

their children at risk of serious health harms. They eat numerous foods in which the Additives have been detected, including dairy products, meat, cooking oils, spices, and various processed foods. Tarrant Decl. ¶¶ 10-11; Cole Decl. ¶ 10; Doughty Decl. ¶ 13; Ames Decl. ¶ 6; Bissell Decl. ¶¶ 9-11; Durrant Decl. ¶ 6; Drew Decl. ¶¶ 7-8; Larson Decl. ¶ 11. Some of Petitioners' members and supporters have limited food options, leading them to rely on processed foods or cafeteria meals that often contain higher phthalate levels. [FDA-010862]; Tarrant Decl. ¶¶ 9, 11-13; Miller Decl. ¶¶ 10-11; Drew Decl. ¶ 6. Some are parents of young children, who are more susceptible to harm from phthalates. Durrant Decl. ¶ 2; Doughty Decl. ¶ 3; Johns Decl. ¶ 12. They invest time and money trying to reduce exposure to phthalates in their food, Tarrant Decl. ¶ 12; Cole Decl. ¶ 13; Doughty ¶¶ 11-12; Ames Decl. ¶ 9; Bissell Decl. ¶ 8; Drew Decl. ¶ 10, and they suffer stress and anxiety knowing they cannot effectively avoid phthalates in food so long as FDA continues authorizing their use, Cole Decl. ¶¶ 11, 15; Doughty ¶ 14; Bissell ¶¶ 8-10, 12; Durrant Decl. ¶ 8; Larson Decl. ¶ 15. These harms satisfy the injury-in-fact requirement. *See Sierra Club v. EPA*, 755 F.3d 968, 974 (D.C. Cir. 2014) (injury-in-fact demonstrated by "particularized fears of serious health and environmental consequences" and "individual behavioral changes prompted by the toxic exposure" that agency action "will cause").

A favorable decision would make it "likely, as opposed to merely speculative" that these injuries would be redressed. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quotation omitted); *see also Teton Historic Aviation Found. v. Dep't of Def.*, 785 F.3d 719, 726 (D.C. Cir. 2015) ("[A] party seeking judicial relief need not show to a certainty that a favorable decision will redress its injury." (quotation and alteration omitted)). A decision from this Court setting aside FDA's Order would likely compel FDA to take action on remand to revoke approval for some or all of the Phthalate Additives, thereby reducing exposure to those chemicals among Petitioners' members and supporters and their children. *See Erwin v. FAA*, 23 F.4th 999, 1005-06 (D.C. Cir. 2022) (explaining that remand would likely redress injuries even if outcome was uncertain); *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 118 (D.C. Cir. 1990) (finding redressability met where "[a] remand that would leave the agency free to exercise its discretion in a proper manner … could lead to agency action that would redress petitioners' injury").

Second, this case advances Petitioners' purpose of protecting the health of their members, supporters, and the public from toxic chemicals such as phthalates. Miller Decl. ¶ 4; Van Vliet Decl. ¶¶ 2, 10; Azimi-Gaylon Decl. ¶¶ 2, 5; Hanson Decl. ¶¶ 3-4; Lurie Decl. ¶¶ 2, 9-10; Carey Perez de Alejo Decl. ¶ 1; Doa Decl. ¶ 3; Johns Decl. ¶ 10.

Third, this lawsuit does not require individual members' participation as it "turns entirely on whether [FDA] complied with its statutory obligations, and the relief it seeks is invalidation of agency action." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015).

## ARGUMENT

## I.     STANDARD OF REVIEW

Since the Food Act does not establish a standard for judicial review of FDA's Order, the Court should apply the standard set forth in the Administrative Procedure Act ("APA"). *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 n. 12 (D.C. Cir. 1995). The APA requires the Court to "hold unlawful and set aside" FDA action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

Agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). The agency must "examine the relevant data and articulate a … rational connection between the facts found and the choice made." *Id.* (quotation omitted).

The Court applies traditional tools of statutory interpretation to "determine the best reading of the statute"—"the reading the court would have reached if no agency were involved." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (quotation omitted).

## II. FDA UNLAWFULLY PLACED ON PETITIONERS THE BURDEN OF PROVING THAT THE PHTHALATE ADDITIVES ARE HARMFUL

The Court should vacate FDA's Order because FDA applied an erroneous legal standard to Petitioners' requests to revoke approval for the Phthalate Additives, improperly imposing on Petitioners the burden of proving that the Additives cause harm under their approved conditions of use. *E.g.*, [FDA-000005-FDA-000006].

This error alone requires vacatur. "Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *PPG Indus. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995).

Moreover, because of this error, FDA failed to determine based on the evidence before it whether there remains a reasonable certainty of no harm from the Phthalate Additives' use, as the Food Act requires. 21 U.S.C. § 348(a)(2), (c)(3)(A); 21 C.F.R. § 170.3(i). Instead, FDA maintained the Additives'

authorizations based on decades-old safety assessments. This too violates the Food Act.

## A. FDA's Approach Contravenes the Food Act

In its Order, FDA unlawfully imposed on Petitioners the burden of proving that the Phthalate Additives are harmful. FDA asserted that, like a company seeking approval for an additive, Petitioners had the burden of proof on the ultimate question of the Additives' safety. *See* [FDA-000005] (Order stating that the Food Act "make[s] clear that the evidentiary burden to support authorization of a food additive's use lies with the petitioner seeking such authorization" and that petitioners seeking revocation of food-additive authorizations "likewise must provide a well-supported petition adequately justifying such action"). And FDA rejected Petitioners' objections because they purportedly did not prove "that dietary exposure levels from [the Phthalate Additives] exceed a safe level." [FDA-000006]; *see also, e.g.*, [FDA-000009] (rejecting Petitioners' toxicity evidence because it supposedly is "insufficient to justify resolution of the factual question of safety" in Petitioners' favor).[6]

---

[6] Even assuming for the sake of argument that FDA applied the correct standard by requiring Petitioners to establish only significant questions regarding the Additives' safety, FDA irrationally concluded that Petitioners failed to meet that standard. *See infra* Point III.

FDA's approach is irreconcilable with the Food Act's central premise for food-additive regulation, which is a presumption that additives are unsafe and prohibited unless the company advocating for their use proves that their use "will be safe," 21 U.S.C. § 348(c)(3)(A)—meaning there is a reasonable certainty that they will cause no health harm under their intended conditions of use, 21 C.F.R. §§ 12.87(d), 170.3(i); *see also* [FDA-002005] (FDA acknowledging that the Act "makes clear that food additives introduced into commerce must be shown to be safe"). FDA's approach also contravenes the Act's broader food safety standard, which is precautionary and rigorous given Congress's "inten[t] to protect the public health from *possible* injury" threatened by substances "which *might* render [food] injurious to the health of consumers." *United States v. Lexington Mill & Elevator Co.*, 232 U.S. 399, 409 (1914) (emphases added). The Act prohibits substances in food that "may possibly injure the health of any" consumer, including those who are particularly susceptible to harm because of their age, underlying health conditions, or other factors. *Id.* at 411. Proof of harm "is not required." *Id.*[7]

---

[7] Under the Food Act, food containing any additive that is not proven safe is "adulterated" and its sale or distribution prohibited. 21 U.S.C. §§ 331, 342(a)(1). *Lexington Mill* discusses the adulteration standard, which, like the contemporary safety standard for additives, turns on whether any added substance in food may make it "injurious to health." 232 U.S. at 411.

To effectuate these standards, the burden of proof in a petition proceeding concerning an additive's safety is necessarily asymmetrical: Companies advocating to obtain or maintain approval for an additive bear a "heavy" burden of proving that its use will be harmless. *Fmali Herb, Inc. v. Heckler*, 715 F.2d 1385, 1391 (9th Cir. 1983). But when FDA or members of the public initiate the procedure to revoke an additive's approval based on safety concerns, they are not required to prove that the additive causes harm. Instead, as FDA has explained in prior proceedings, such petitioners must provide evidence that raises "significant questions as to the safety of the authorized uses." [FDA-009083]. If "there is a lack of data … to address these questions" and support a reasoned determination that the additives' continued use will be safe, revocation is warranted. *Id.*

Although FDA referenced the correct standard for revocation petitions in its 2022 decision denying the Food Additive Petition, [FDA-002005], and claimed in a portion of the Order that it applied that standard, [FDA-000006], the Order as a whole demonstrates that FDA imposed on Petitioners the burden of proving that the Additives cause harm under their approved conditions of use. FDA's rationale in the Order is not a model of clarity, but appears to rest on FDA's misguided view that, because the Food Act directs FDA to promulgate regulations establishing "procedure[s]" for revocation petitions that "conform" to the Act's procedures for approving additives, 21 U.S.C. § 348(i), the evidentiary burden on petitioners

seeking revocation of food-additive authorizations must be the same as the burden on petitioners seeking approval. [FDA-000004-FDA-000005].

That is not the "best reading" of the statute. *Loper Bright*, 603 U.S. at 400. The statutory directive to make the *procedures* for revocation petitions consistent with the procedures for approving additives does not alter the Food Act's substantive mandate prohibiting additives for which there are any significant safety concerns. *See* 21 U.S.C. § 348(c)(3)(A) (requiring proof that additive "will be safe"); 21 C.F.R. § 170.3(i) ("Safe … means … reasonable certainty … that the substance is not harmful under the conditions of its intended use."). To effectuate that mandate, FDA may not deny a revocation petition because, in its view, the petitioner has failed to prove that the additives' use is in fact harmful.

## B.     FDA's Approach Contravenes Its Regulations

Imposing the burden of proof on Petitioners also violates FDA's regulations. Those regulations are explicit that the party in petition proceedings "who is contending that the [additive] is safe … and who is … contesting withdrawal of approval has the burden of proof in establishing safety." 21 C.F.R. § 12.87(d); *see also Nat. Res. Def. Council v. FDA*, 884 F. Supp. 2d 127, 139 (S.D.N.Y. 2012) (holding that, in FDA-initiated proceeding to revoke animal drug approval, also governed by 21 C.F.R. § 12.87, "FDA has the initial burden of producing evidence that the drug has not been shown to be safe" but "the drug sponsor has the burden

of persuasion on the ultimate question of whether the drug is shown to be safe" (quotation and alteration omitted)); [FDA-021154] (FDA explaining that "to institute a proceeding to limit or revoke the approval of [an additive], FDA would not be required to show that [the additive] is unsafe.… [The company which petitioned for its approval] would have the burden to establish the safety of the additive.").

Accordingly, FDA's regulation governing revocation petitions does not require petitioners to provide evidence proving that exposure to the additive exceeds safe levels, as FDA required here. Instead, it requires revocation petitions to include only "an assertion of facts, supported by data, showing that new information exists with respect to the food additive …, that new data are available as to toxicity of the chemical, or that experience with the existing regulation … may justify its amendment or repeal." 21 C.F.R. § 171.130(b).

Interpreting substantially similar Food Act regulations governing petitions to repeal pesticide tolerances, which establish allowable levels of pesticide residue in food, the Ninth Circuit rejected the agency's argument (there, the Environmental Protection Agency ("EPA")) that petitioners seeking revocation of tolerances bear "a burden of persuasion" to "affirmatively demonstrate that the tolerances are unsafe." *League of United Latin Am. Citizens v. Regan*, 996 F.3d 673, 695 (9th Cir. 2021) ("*LULAC*"). Instead, the court held that the regulations—which, like those at

issue here, require petitioners to provide "an assertion of facts" with supporting data "showing … that new data are available as to toxicity of the chemical, or that experience with the application of the [existing regulation] … may justify its modification or revocation"—impose only "a burden of production" on petitioners, not the burden of proof on the tolerance's safety. *Id.* at 694-95 (quoting 40 C.F.R. § 180.32(b)). The court emphasized that imposing that burden of proof on petitioners would contravene the regulatory language and the Food Act's health-protective purpose—a conclusion that applies with equal force here. *Id.*[8]

## C. FDA's Approach Is Inconsistent with Past Practice

FDA's Order cannot be reconciled with past agency practice, notably FDA's 2016 decision granting a petition to revoke food-additive authorizations for three long-chain perfluorinated chemicals (the "PFAS Additives"). [FDA-009081-FDA-009084]. There, FDA affirmed that its regulations require petitioners seeking revocation of food-additive authorizations to "demonstrate that new data are

---

[8] FDA's Order dismissed *LULAC* on the basis that the Food Act's provisions governing pesticide tolerances provide that EPA "may establish *or leave in effect* a tolerance … only if [EPA] determines that the [tolerance] is safe," which the Ninth Circuit read to "impose[] a continuous duty" to ensure the safety of tolerances. [FDA-000005] (quoting *LULAC*, 996 F.3d at 692). But this textual distinction does not salvage FDA's position. As FDA acknowledges, it, like EPA respecting pesticide tolerances, has a "continuing obligation to oversee the safety of the food supply," including by assessing "whether there continues to be a basis for a reasonable certainty that the use of [an approved food additive] is not harmful," [FDA-021153], and to revoke approval for additives when the current evidence no longer supports that safety finding, [FDA-009082-FDA-009083].

available as to the toxicity of the food additive that may justify amendment of the food additive regulation." [FDA-009082] (discussing 21 C.F.R. §§ 171.1, 171.100, 171.130). FDA noted that those petitioners provided information post-dating FDA's approval of the PFAS Additives showing that similar chemicals are associated with reproductive and developmental harm. [FDA-009083]. FDA determined that the evidence linking similar chemicals to these health harms and showing that the chemicals can build up in the body "raise[d] significant questions as to the safety of the authorized uses" of the PFAS Additives. *Id.* Because FDA lacked "data specific to the three [PFAS Additives] to address these questions," it concluded "that there is no longer a reasonable certainty of no harm from the[ir] food contact use" and revoked their authorizations. *Id.* FDA did not require the petitioners to prove that the PFAS Additives are harmful; indeed, it acknowledged a lack of studies establishing the toxic effects of the specific PFAS Additives or evidence that would permit FDA to quantify consumer exposures to those additives. *Id.*

FDA's approach here cannot be reconciled with its decision granting the PFAS Additives petition. FDA's "failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision making." *Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) (quotation omitted).

In sum, contrary to the Food Act, FDA's regulations, and past practice, FDA required Petitioners to prove that use of the Phthalate Additives causes harm because their "dietary exposure levels … exceed a safe level." [FDA-000006]. For this reason alone, FDA's Order must be set aside. *PPG Indus.*, 52 F.3d at 365.

### D. FDA Failed to Determine Whether the Phthalate Additives Are Safe

Moreover, due to this error, FDA failed to reassess the Phthalate Additives' safety in light of the evidence presented and either determine that there remains a reasonable certainty of no harm from the Additives' use or, if FDA could not rationally do so, revoke their approvals. *Cf.* [FDA-009083] (FDA explaining that it revoked the PFAS Additives' approvals because data for similar chemicals "raise[d] significant questions as to the safety of the [PFAS Additives]" and "there [was] a lack of data specific to the [PFAS Additives] to address these questions"). Thus, strikingly absent from FDA's Order is any determination that, based on the evidence before FDA at the time of its decision, ongoing use of the Phthalate Additives "will be safe." 21 U.S.C. § 348(c)(3)(A).

To the contrary, the information request FDA issued the same day it denied the Petition affirms that FDA is still relying on safety assessments it conducted on the Phthalate Additives approximately 40-60 years ago to justify their ongoing use, and that it "may" choose to update these assessments at some unidentified future time. [FDA-021102]. Consistent with those statements, FDA's Order makes no

claim that FDA assessed the Additives' safety in response to Petitioners' objections. *See* [FDA-000007] (FDA declining to dispute Petitioners' assertion that "FDA did not conduct a new safety analysis of … the five [Phthalate Additives]" and stating that FDA conducted that analysis only "[w]hen we originally authorized the use of these five additives" 40-plus years ago). Indeed, FDA did not even consider the basis for its safety determinations when evaluating whether the new evidence Petitioners presented undermines those determinations; FDA's safety assessments for the Additives are not in record. *See* Administrative Record Index, Doc. 2104809.

FDA's continued reliance on decades-old safety assessments for the Phthalate Additives, which it refused to update during its eight-year review of Petitioners' Petition and objections, violates the Food Act. As FDA acknowledges, the Act imposes on FDA a "continuing obligation to oversee the safety of the food supply" by determining "whether there *continues to be* a basis for a reasonable certainty that the use of [an additive] is not harmful." [FDA-021153] (emphasis added); *see also* 21 U.S.C. § 348(a), (c)(3) (providing that all additives are presumptively unsafe and unlawful unless "a fair evaluation of the data before [FDA]" proves their use "will be safe"). Here too, FDA's decision cannot be reconciled with its decision granting the PFAS Additives petition, where FDA reviewed the new safety information the petitioners provided and "also conducted

its own updated critical review of the literature database … in order to assess whether the overall weight of the evidence" supported the requisite safety finding. [FDA-003329]. This unexplained inconsistency is the hallmark of arbitrary decision-making. *Ramaprakash*, 346 F.3d at 1125.

Further, if accepted, FDA's approach would permit the agency to continue playing "administrative keep-away" with the question of the Phthalate Additives' safety, *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 420 (D.C. Cir. 2004), which leading experts have characterized as an urgent public health issue requiring immediate resolution, [FDA-010722] (Hauser Declaration); [FDA-010871] (Zota Declaration). FDA launched a formal investigation into the safety of using phthalates in food-contact materials *17 years ago*, [FDA-013184], and presided over an eight-year petition proceeding centered on the same question. Yet the public continues to consume the Phthalate Additives based on decades-old safety assessments, which FDA will not commit to updating. This recalcitrance makes a mockery of FDA's duty to "ensur[e] that … foods are safe," 21 U.S.C. § 393(b)(2)(A), and violates its obligation to determine "whether there continues to be reasonable certainty of no harm from the use of" the Phthalate Additives, [FDA-021153]; *see* 21 U.S.C. § 348(a), (c)(3). For this reason too, FDA's Order should be vacated.

### III. FDA ARBITRARILY REJECTED EVIDENCE THAT RAISES SIGNIFICANT QUESTIONS ABOUT THE PHTHALATE ADDITIVES' SAFETY

In denying Petitioners' objections, FDA arbitrarily dismissed decades of evidence that raises significant questions about the Phthalate Additives' safety. First, FDA irrationally dismissed extensive toxicity evidence post-dating its authorizations that links the Additives to numerous health harms and identifies the exposure levels at which harm may occur. This includes toxicological studies on animals and epidemiological studies, which record observed associations between chemical exposures and health harms in people. Second, FDA irrationally disregarded evidence that dietary exposures to the Additives pose health risks. Third, FDA unlawfully disregarded the cumulative effects of people's exposure to multiple phthalates in their diet that contribute to the same health harms and therefore increase their risks of harm.

#### A. FDA Irrationally Disregarded Decades of New Toxicity Evidence

Petitioners provided FDA with decades of toxicity evidence post-dating FDA's approval of the Phthalate Additives, which satisfied Petitioners' burden of providing new toxicity data that creates significant safety questions. 21 C.F.R. § 171.130(b); [FDA-009083]; [FDA-002005]. FDA's Order irrationally dismisses this evidence and provides no reasoned basis for concluding that the evidence fails to establish significant safety questions.

1. **Petitioners submitted extensive evidence post-dating FDA's approvals linking the Phthalate Additives to serious health harms**

As FDA acknowledges, "the body of available toxicological information on phthalates has expanded" since FDA assessed the Phthalate Additives' safety "during the period of 1961 through 1985." [FDA-021102]. Indeed, in support of their Petition and objections, Petitioners presented more than two hundred new studies addressing phthalates' toxic effects, the doses at which those effects may occur, and the mechanisms through which the chemicals cause harmful changes in the body, as well as assessments of that evidence by other federal authorities. *See* [FDA-012446-FDA-012471]; [FDA-018696-FDA-018721]; [FDA-010658-FDA-010660, FDA-010692-FDA-010696]. Petitioners also submitted declarations from leading experts in phthalates' health effects synthesizing the evidence and concluding that FDA's authorization of phthalate use in food-contact materials is harming human health. [FDA-010697-FDA-010848]; [FDA-010849-FDA-010940].

The toxicity evidence presented includes peer-reviewed studies linking the Phthalate Additives to adverse effects on brain development and preterm birth, [FDA-009547-FDA-009549]; [FDA-018699-FDA-018700]—health harms that were not documented in the scientific literature when FDA approved the Additives decades ago and which, therefore, FDA never considered in determining the

Additives are safe. *Compare* [FDA-011906] (Engel et al. 2021) (explaining that "robust data from longitudinal birth cohort studies conducted over the last decade … have shown associations between prenatal exposures to ortho-phthalates and attention-deficit hyperactivity disorder (ADHD), other behavioral problems, adverse cognitive development including lower IQ, poorer psychomotor development, and impaired social communication"), *with* [FDA-002018-FDA-002024] (FDA scientists' 1973 paper summarizing toxicology literature on approved phthalates, identifying no studies on neurodevelopmental effects). *See also* [FDA-000610-FDA-000627] (reviewing studies on neurodevelopmental effects of DEHP, all of which post-date 1985); [FDA-000380, FDA-000574-FDA-000583] (reviewing pre-term birth studies, which likewise post-date 1985).

In addition, Petitioners submitted research showing that adverse effects may occur at substantially lower doses than studies indicated at the time of FDA's approvals. *Compare* [FDA-001125] (identifying 4.8 milligrams per kilogram of bodyweight per day as "no adverse effect" level for DEHP), *with* [FDA-002021] (1973 paper by FDA scientists identifying no-effect level for DEHP of 60 milligrams per kilogram of bodyweight per day or higher).

Petitioners also submitted evidence of many other health harms linked to the Phthalate Additives, including recent studies linking DCHP to elevated cholesterol and reproductive harm; DINP to liver toxicity and insulin resistance; and DEHP to

36

developmental toxicity, reproductive toxicity, liver toxicity, immune system harm, diabetes, hormonal effects, and breast cancer recurrence. [FDA-009547-FDA-009549, FDA-009581-009585]. And Petitioners provided FDA's 2012 guidance for drug manufacturers, which reviewed recent research linking DEHP to multiple adverse health effects and concluded that DEHP should not be used in regulated drugs because of the risks of developmental and reproductive toxicity. [FDA-013334-FDA-013337].

These submissions more than satisfied Petitioners' burden of "assert[ing] … facts, supported by data, showing that … new data are available as to toxicity of the [Phthalate Additives]" that raise significant questions about their safety, 21 C.F.R. § 171.130(b); [FDA-009083]; [FDA-002005], and belie FDA's conclusory assertion that Petitioners did not adequately explain "why these materials support a finding that there are significant [safety] questions." [FDA-000008].

### 2. FDA irrationally discounted Petitioners' toxicity evidence

To the extent FDA addressed the substance of this evidence, it failed to rationally conclude that the evidence raises no significant safety questions.

FDA's Order asserted that the evidence is inadequate because the toxicity studies purportedly fail to "place[]" the identified health hazards "in the context of exposure." *Id*. As FDA explained, "when evaluating the safety of a substance, scientists will often determine the 'dose-response' relationship of substance

exposure and toxic effect" and use that data to calculate an acceptable daily intake level for a chemical that can be compared to real-world exposures to assess risk. [FDA-000008-FDA-000009]. Contrary to FDA's claim, Petitioners provided dose-response studies. For example, they provided multiple studies showing reproductive and developmental effects from different doses of DEHP. *See, e.g.*, [FDA-012983-FDA-012994]; [FDA-015301-FDA-015312]; [FDA-011794-FDA-011803]; [FDA-009728-FDA-009747]; [FDA-009970-FDA-009979]. These studies contain precisely the sort of data on which FDA "typically base[s]" its calculation of acceptable intake levels. [FDA-000009] (Order). Petitioners also provided assessments by other governmental authorities synthesizing dose-response data for the Phthalate Additives and identifying exposure levels associated with harm. *See, e.g.*, [FDA-000386, FDA-000392-FDA-000470] (Agency for Toxic Substances and Disease Registry ("ATSDR") report reviewing dose-response studies on DEHP and calculating exposure levels below which non-cancer health harms are not expected).

FDA's Order does not dispute these studies' findings, asserting instead that the objections supposedly did not explain "how these studies would be adequate to assess the safety" of the Phthalate Additives. [FDA-000009]. This is inadequate to sustain FDA's decision. To the extent this statement reflects FDA's position that Petitioners had to prove that exposure to the Additives exceeds safe levels, [FDA-

000006], that approach is unlawful. *See supra* Point II. Further, "[w]hen an agency
… is confronted with evidence that its current regulations are inadequate or the
factual premises underlying its prior judgment have eroded, it must offer more to
justify its decision to retain its regulations than mere conclusory statements." *Env't
Health Tr. v. FCC*, 9 F.4th 893, 903 (D.C. Cir. 2021).

An FDA staff memorandum not referenced in FDA's Order but included in
the record asserts that some studies Petitioners provided "exhibited multiple
limitations" that make them unsuitable for assessing the Additives' risks. [FDA-
009519-FDA-009520]. To the extent FDA relied on this memorandum, it only
underscores the arbitrariness of FDA's approach. For example, the memorandum
contends that "several" studies Petitioners provided assessed shorter-duration
exposures to the Phthalate Additives and are "therefore insufficient to assess
chronic toxicity which is essential for the assessment of food additive safety."
[FDA-009519-20]. Assuming for the sake of argument that chronic toxicity studies
are "essential," [FDA-009520], that only concedes the deficiency of FDA's own
safety assessments. According to FDA scientists, FDA had no chronic studies to
support its authorizations for numerous phthalates it approved for food-contact use,
including DIDP. *See* [FDA-002021] (summarizing available toxicity studies for
FDA-approved phthalates as of 1973). It is quintessentially arbitrary for FDA to
hold Petitioners to an evidentiary standard that FDA's own safety assessments do

not meet. Indeed, as noted *supra* p. 32, in deciding to reject Petitioners' objections and retain its authorizations for the Phthalate Additives, FDA did not even consider whether its own assessments are supported by the evidence its Order and internal memoranda assert is essential to determine whether the Additives are safe.

Further, FDA's memorandum criticizes certain unidentified studies while ignoring others that do not exhibit the asserted "limitations." For example, the memorandum does not address the data from chronic exposure studies that Petitioners did provide. *See, e.g.*, [FDA-000449-FDA-000457] (summarizing chronic studies on DEHP); [FDA-001469] (summarizing chronic studies on DINP). Nor does the memorandum address the shorter-duration studies Petitioners provided documenting harm from phthalate exposure at specific life stages, *see, e.g.*, [FDA-009970-009979] (assessing effects of DEHP exposure during puberty); [FDA-009757-009769] (same), which FDA's memorandum acknowledges "may be sufficient" for assessing safety. [FDA-009520].

FDA's Order also irrationally dismissed the epidemiological studies Petitioners presented on the theory that epidemiological studies "are generally not useful for risk assessment." [FDA-000009]. This contravenes, without reasoned explanation, the approach of other federal authorities. *See* [FDA-001443] (CPSC expert panel explaining that it "employed a risk assessment approach that first analyzed the epidemiological evidence of associations between phthalate

exposures and risk to human health" in conjunction with animal studies); [FDA-000379-FDA-000382, FDA-000388-FDA-000391, FDA-000472-FDA-000670] (ATSDR evaluating epidemiological and animal studies to characterize DEHP's risks). FDA's position also inexplicably contravenes FDA's own reliance on epidemiological studies to support its conclusion that "DEHP from pharmaceuticals presents a potential risk of developmental and reproductive toxicity" and should not be used in certain drug products. [FDA-013336]. "Agency action is … arbitrary and capricious if it offered insufficient reasons for treating similar situations differently." *Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1057 (D.C. Cir. 2019) (quotation omitted).

FDA also dismissed certain epidemiological studies because they are supposedly "insufficient to establish a relationship between the reported health effect outcomes and the purported cause being phthalate exposure." [FDA-009521]. But as CPSC explained, "[e]stablishing cause and effect in epidemiological studies is not required by federal and international agencies to conclude that a substance [with toxic effects in animal studies] is likely to cause similar effects in humans." Prohibition of Children's Toys and Child Care Articles Containing Specified Phthalates, 82 Fed. Reg. 49,938, 49,952 (Oct. 27, 2017).

FDA also considered the evidence piecemeal, asking whether subsets of studies by themselves establish sufficient questions about the Phthalate Additives'

safety. *See, e.g.*, [FDA-000009] (Order asserting that "data from [the] hazard identification studies are … not adequate to … justify resolution of the factual question of safety" in Petitioners' favor); *id.* (dismissing governmental assessments on identical grounds); *id.* (asserting that epidemiological studies are "not suitable to provide primary or sufficient basis for performing a risk assessment"). As FDA acknowledges, it must integrate all available data on "the projected human dietary exposure to the food additive, the additive's toxicological data, and other available relevant information." [FDA-000008-FDA-000009]. Further, it is irrational for FDA to discount discrete categories of evidence because they do not *alone* resolve the ultimate safety question. FDA's obligation is "to weigh the entire record," and "the corollary to [that] obligation … is that no single piece of evidence is dispositive." *Mississippi v. EPA*, 744 F.3d 1334, 1349 (D.C. Cir. 2013) (quotation omitted).

FDA was required to rationally consider the totality of the evidence to determine whether Petitioners raised significant questions about the Phthalate Additives' safety. Instead, FDA dismissed the wealth of evidence showing that the Additives pose serious health risks—*including risks FDA never considered in judging them safe decades ago*—based on reasoning at odds with other authoritative bodies, inconsistent with FDA's own approach in approving the Additives, and untethered from the requirements of the Food Act and FDA's

regulations. FDA thus did not rationally "examine the relevant data," and its decision is arbitrary. *Cigar Ass'n of Am. v. FDA*, 126 F.4th 699, 705 (D.C. Cir. 2025) (quotation omitted), *amended by* No. 23-5220, 2025 WL 913477 (D.C. Cir. Mar. 26, 2025); *see also id.* at 705 n.2 (concluding that FDA action was arbitrary when FDA described studies but "failed to *respond* to those studies' implications," since "[g]rappling with relevant data requires more than a mere recitation of unfavorable evidence without further explanation").

### B. FDA Irrationally Disregarded Evidence of Unsafe Exposures

FDA also arbitrarily rejected Petitioners' objections on the basis that the information Petitioners provided about exposure to the Phthalate Additives was "lacking." [FDA-000013-FDA-000014]. Nothing in the Food Act or FDA's regulations requires petitioners seeking revocation of food-additive authorizations to provide data establishing levels of dietary exposure to the additives, let alone prove "that dietary exposure levels from [the] approved [additives] exceed a safe level," as FDA required here. [FDA-000006]. Even assuming that Petitioners were required to provide exposure information, they did, and that information more than suffices, in combination with the toxicity information, to raise "significant questions" about the Additives' safety. [FDA-009083].

### 1. FDA's position has no basis in the statute or regulations

Petitioners agree with FDA that it must consider the level of human exposure to an additive in assessing safety. *See* 21 U.S.C. § 348(c)(5)(A); 21 C.F.R. § 170.3(i)(1). However, nothing in the Food Act or FDA's regulations requires petitioners requesting revocation of food-additive authorizations to provide data that quantifies exposure to the additives. Instead, as noted, FDA's regulation requires such petitioners to provide factual assertions, supported by data, "showing that new information exists with respect to the food additive …, that new data are available *as to toxicity of the chemical*, or that experience with the existing regulation … may justify its amendment or repeal." 21 C.F.R. § 171.130(b) (emphasis added); *see also* [FDA-009082-FDA-009083] (FDA affirming, in granting PFAS Additives petition, that it may grant revocation petitions "based upon new data concerning *the toxicity* of the food additive" where "such data" support the petitioner's request (emphasis added)). The regulation's direction that this data "be furnished in *the form* specified" in 21 C.F.R. § 171.1, 21 C.F.R. § 171.130(b) (emphasis added), does not impose additional substantive requirements and, even if it did, section 171.1 does not require submission of exposure data. *See id.* § 171.1.

Nevertheless, FDA justified its denial of the objections in part by asserting that Petitioners' exposure information was "lacking." [FDA-000013-FDA-000014].

FDA did not identify any statutory or regulatory authority requiring Petitioners to submit exposure information or providing any standard against which FDA could reasonably find the information submitted inadequate; FDA merely stated that Petitioners "must provide support for the requested changes." [FDA-000013].

### 2. FDA's dismissal of the exposure evidence is irrational

The record demonstrates that—despite the lack of any statutory or regulatory requirement to do so—Petitioners provided substantial evidence that current levels of exposure to the Phthalate Additives threaten public health. FDA's justifications for dismissing that evidence do not reflect a reasoned evaluation of the evidence and are inadequate to sustain FDA's decision.

First, Petitioners provided multiple authoritative analyses concluding that diet is the primary source of exposure to, at a minimum, DINP, DIDP, and DEHP. These include ATSDR's 2022 toxicological profile of DEHP, which concluded that "[t]he principal route of human exposure to DEHP is oral" and "ingestion of food (including food from containers that leach DEHP) accounts for approximately 95% of total oral exposure." [FDA-000374].

Petitioners also presented the 2014 report from CPSC's expert panel, which conducted a comprehensive analysis of phthalate exposures and concluded that "food, beverages and drugs via direct ingestion … constituted the highest [source of] phthalate exposures to all subpopulations." [FDA-001377, FDA-001427]; *see*

82 Fed. Reg. at 49,946 (describing panel's methodology for estimating exposures).

The panel specifically determined that diet is the primary source of exposure to

DINP, DIDP, and DEHP for the populations at greatest risk of reproductive and

developmental harm. *See* [FDA-001433].

Petitioners also provided a declaration from Dr. Russ Hauser, a member of

CPSC's expert panel and an internationally recognized expert on phthalates' health

effects, who explained that

> The [CPSC's] conclusions about the dangers associated with phthalates found in toys and other children's products apply with equal force to the dangers of exposure to phthalates in foods and beverages. The need to remove these chemicals from the food supply is critical given how widespread and substantial dietary phthalate exposures are among the U.S. population, including at developmentally critical periods in early life.

[FDA-010719-FDA-010720].

In addition, Petitioners provided their own analysis demonstrating that

DEHP exposure in the U.S. exceeds safe levels, and that exposure to additional

phthalates in food that contribute to the same health harms as DEHP exacerbates

the health risks. [FDA-009577-FDA-009579]; [FDA-012365-FDA-012369]. This

analysis utilized biomonitoring data from the CDC's National Health and Nutrition

Examination Survey ("NHANES") and ATSDR's determination of the exposure

level at which DEHP can cause harm. [FDA-009577-FDA-009578].

FDA's response to this evidence falls short of the reasoned decision-making

the APA requires. FDA dismissed the CPSC expert panel's report because, on its

own, "it did not answer the question of whether specific food additive uses of [the Phthalate Additives] are safe." [FDA-000014]. But "the corollary to [the agency's] obligation to weigh the entire record ... is that no single piece of evidence is dispositive." *Mississippi*, 744 F.3d at 1349 (quotation omitted). FDA cannot reasonably dismiss the report's findings because it alone "does not answer *all* of the technically complex questions" presented. *Pub. Citizen Health Rsch. Grp. v. Chao*, 314 F.3d 143, 156 (3d Cir. 2002) (quotation omitted).

CPSC's expert panel determined that exposure to multiple Phthalate Additives among high-risk populations presents unacceptable health risks and that this exposure comes primarily from food. [FDA-001426, FDA-001433, FDA-001465, FDA-001473]. Based on the panel's findings, CPSC determined that it was necessary to ban use of the Phthalate Additives DINP and DCHP in children's products (Congress had already banned DEHP)—to "ensure a reasonable certainty of no harm" to children and pregnant women. 82 Fed. Reg. at 49,966 (quotation omitted); *see also id.* at 49,970. It strains credulity for FDA to assert that the panel's findings are not relevant to determining whether there continues to be a reasonable certainty of no harm from using these same chemicals in food-contact materials.

FDA also irrationally dismissed ATSDR's findings concerning DEHP because, like the CPSC panel's report, ATSDR's toxicological profile for DEHP

does not alone "justify resolution of the factual question about unsafe exposure in the objectors' favor." [FDA-000014]. That is why Petitioners presented substantial additional evidence characterizing exposures to the Phthalate Additives that, in conjunction with the ATSDR profile, raises significant safety questions. FDA also suggested that ATSDR did not identify exposure levels of concern because it found that "the general population is exposed to DEHP at levels that are 3-4 orders of magnitude lower than those observed to cause adverse health effects *in animal studies*." *Id.* (emphasis added). But ATSDR calculated the exposure level at which DEHP may cause harm *to humans* and found that exposures in the U.S. exceed that level, providing the relevant point of comparison. [FDA-000386, FDA-000756, FDA-000870-FDA-000877]. FDA offered no explanation for why that finding is irrelevant or fails to support significant safety questions in conjunction with the other evidence presented.

FDA also failed to articulate a reasoned basis for dismissing Petitioners' independent analysis demonstrating that DEHP exposure exceeds safe levels, and that the resulting health risks are exacerbated by co-exposure to additional phthalates. FDA claimed it is inappropriate to "rely[] on biomonitoring data," such as that from NHANES, "alone" to estimate exposures because such data do not "differentiate the amount of exposure that results from the diet compared to other sources." [FDA-000015]. But Petitioners did not rely on biomonitoring-based

exposure estimates "alone" to establish significant questions about the Phthalate Additives' safety. In addition to the independent exposure analysis they provided utilizing NHANES data, they also relied, for example, on the findings of CPSC's expert panel, which conducted a "scenario-based exposure assessment" that was based on exposure modeling and supported the panel's conclusion that diet is the primary exposure source for multiple Phthalate Additives. 82 Fed. Reg. at 49,946. Further, given the undisputed findings by CPSC's expert panel and ATSDR that diet is the primary exposure source for multiple Phthalate Additives, biomonitoring data provide valuable information that FDA could use to, at a minimum, "qualitatively assess[]" the safety of exposure to the Phthalate Additives as FDA did for the PFAS Additives. [FDA-009083]. Indeed, CPSC relied on NHANES data to support its bans on phthalates in children's products. *See* 82 Fed. Reg. at 49,960 (CPSC describing NHANES as "a high quality study" that "provide[s] exposure data that are representative of the U.S. population" and appropriate for assessing phthalates' safety). And FDA itself invoked NHANES data to support its conclusion that DEHP's use in drugs presents unacceptable health risks. [FDA-013336]. In short, the fact that the NHANES biomonitoring data do not capture dietary exposures alone does not rationally justify dismissing exposure estimates based on that data.

Moreover, as the objections explained, total exposure to the Phthalate Additives from all sources is relevant to assessing whether their use in food-contact materials is safe, because exposure from food will more readily cause people to reach unsafe exposure levels if they are simultaneously exposed from other sources. [FDA-009576-FDA-009577]. FDA did not dispute that, consistent with the recommendations of the National Academy of Sciences, other federal agencies regularly consider chemical exposures from all sources even if some are outside the agency's regulatory authority. *Compare id.* (objections), *with* [FDA-000016] (Order). Instead, FDA claimed it can ignore non-food exposures to the Phthalate Additives because the Food Act does not explicitly mandate their consideration. [FDA-000016]. This argument ignores that the Act requires FDA to consider dietary exposure to additives and "other relevant factors" in evaluating an additive's safety. 21 U.S.C. § 348(c)(5). Petitioners explained why exposures to the Phthalate Additives from other sources are relevant to assessing whether additional exposures from food will be safe, [FDA-009576-FDA-009577], and FDA provided no substantive response, asserting only that it has "discretion" to consider safety-related factors beyond those enumerated in the statute. [FDA-000016]. But this bare appeal to discretion does nothing to answer Petitioners' argument that total exposure is a "relevant factor[]," which FDA is statutorily required to consider. 21 U.S.C. § 348(c)(5) (directing that FDA "shall consider … other relevant factors" in

assessing an additive's safety, beyond the three factors enumerated in the statute). FDA's "fail[ure] to consider [this] important aspect of the problem" renders its decision arbitrary and capricious. *State Farm*, 463 U.S. at 43.

### C. FDA Irrationally Disregarded the Cumulative Effect of Multiple Phthalates That Cause the Same Health Harms

#### 1. FDA must consider the cumulative effect of related phthalates in food

In evaluating a food additive's safety, FDA must consider "the cumulative effect of such additive in the diet …, taking into account any chemically or pharmacologically related substance or substances in [the] diet." 21 U.S.C. § 348(c)(5)(B); *see also* 21 C.F.R. §§ 170.18(a), 170.3(i)(2).

This is critical for evaluating the Phthalate Additives' safety. As noted, "almost all people in the United States have metabolites"—or breakdown products—"of multiple phthalates in their body, indicating exposure to many phthalates" simultaneously. [FDA-010720] (Hauser Declaration). Further, the scientific literature demonstrates that "exposure to multiple phthalates will, at a minimum, have additive health effects, if not synergistic health effects, that can magnify the health harms associated with individual phthalates." [FDA-010721] (Hauser Declaration).[9]

---

[9] "Synergistic" effects are effects from multiple chemicals working in combination that are greater than their additive effect.

### 2. FDA unlawfully disregarded the cumulative effect of dietary exposure to the related phthalates DEHP, DINP, DCHP, and DIOP

Contrary to the Food Act's mandate to consider the cumulative effect of related chemicals in the diet, FDA failed to address the undisputed evidence that three of the Phthalate Additives—DEHP, DINP, and DCHP—as well as DIOP, another phthalate approved for food-contact use under a prior sanction, are chemically and pharmacologically related and pose cumulative health risks. As Petitioners' objections explained, these four chemicals are structurally similar and all cause permanent malformations of the male reproductive system through a common mechanism of "antiandrogenic" action, which refers to the suppression of testosterone production, during fetal development. [FDA-009565-FDA-009567]; *see also* [FDA-002008] (FDA acknowledging that Petitioners provided data indicating that DEHP, DINP, and DCHP exhibit antiandrogenic effects).[10]

Petitioners thus demonstrated that DEHP, DINP, DCHP, and DIOP are "chemically or pharmacologically related," 21 U.S.C. § 348(c)(5)(B), because they have (1) "well-defined similarities in chemical structure," (2) a common "toxicological endpoint[]," or adverse health effect, and (3) "a common mechanism

---

[10] In the objections, Petitioners proposed alternative ways of grouping phthalates for cumulative effects analysis, [FDA-009558-FDA-009565], but focus here on FDA's unlawful failure to consider the cumulative effects of the known antiandrogenic phthalates that remain approved for food-contact use, which alone warrants vacatur of FDA's Order.

of action" for inducing that effect. [FDA-002009] (FDA identifying these factors as supporting other regulatory and scientific authorities' grouping of phthalates for cumulative effects analysis).[11] Petitioners also presented research explaining that, because "[a]nti-androgenic phthalates may have additive adverse effects on … reproductive organ development," assessing their risks cumulatively is more "relevant for human health and development than chemical-by-chemical approaches." [FDA-010913-FDA010914] (Varshavsky et al. 2018).

In declining to consider the cumulative effects of the four antiandrogenic phthalates still approved for food-contact use, FDA did not contest that they are "related" within the meaning of the Food Act. Instead, FDA asserted that even if Petitioners are correct that DEHP, DCHP, DINP, and DIOP are related, triggering the statutory requirement for FDA to consider their cumulative effects, "the outcome of FDA's denial order would not be altered" because the Food Additive

---

[11] There is no requirement that chemicals satisfy all three of these criteria to trigger the Food Act's requirement for a cumulative effects analysis. *See* 21 U.S.C. § 348(c)(5)(B) (requiring FDA to consider cumulative effects of any "chemically *or* pharmacologically related substance[s]," indicating that similarity in structure or effect suffices (emphasis added)); 21 C.F.R. § 170.18(a) (directing that "[f]ood additives that cause similar or related pharmacological effects will be regarded as a class, and in the absence of evidence to the contrary, as having additive toxic effects and will be considered as related food additives"). Regardless, DEHP, DINP, DCHP, and DIOP satisfy all three criteria.

Petition advanced a broader argument regarding the relatedness of the 28 phthalates approved as additives in 2016. [FDA-000012].

This is not a reasoned basis for FDA's refusal to consider the cumulative effects of the known antiandrogenic phthalates that remain approved for food-contact use. First, the Food Additive Petition argued that all 28 phthalates approved as additives in 2016 are related but never asserted that it would be improper to group a narrower subset for cumulative effects analysis. Further, as discussed above, it would have been irrational for Petitioners to continue pursuing arguments about the relatedness and safety of the 28 phthalates approved as additives in 2016 after FDA revoked approval for 23 of those chemicals in response to the industry abandonment petition. Moreover, FDA does not dispute that, at the objections stage of petition proceedings, parties may present new evidence and arguments, for example to respond to changed regulatory circumstances or provide new scientific findings or analysis. *See* 21 U.S.C. § 348(f), (g)(2); 21 C.F.R. §§ 12.22, 12.100. FDA acknowledged as much by evaluating the "new exposure analysis" Petitioners provided with their objections. *See* [FDA-000015]; *see supra* p. 48-51.

Indeed, FDA also implicitly recognized its duty to consider whether the currently authorized Phthalate Additives—not the group of 28 approved in 2016—present cumulative health risks. In a staff memorandum supporting its denial of the Food Additive Petition, FDA evaluated whether the five Phthalate Additives that

remain approved following FDA's grant of the abandonment petition—DINP, DEHP, DCHP, DIDP, and DAP—are "related" such that FDA must consider their cumulative effects. [FDA-000017-FDA-000026]. But Petitioners never argued that this group of five phthalates are related; as noted, Petitioners argued instead that three of the Phthalate Additives (DINP, DEHP, and DCHP), plus an additional phthalate approved under a prior sanction (DIOP) are related. [FDA-009565-FDA-009567]. Accordingly, FDA's memorandum provides no answer to the argument that the antiandrogenic phthalates DINP, DEHP, DCHP, and DIOP are chemically and pharmacologically related such that FDA must consider their cumulative effects as part of a determination of whether food-additive use of DINP, DEHP, or DCHP is safe. Nowhere in the record did FDA consider the cumulative effects of these related phthalates nor rationally refute Petitioners' argument that these chemicals are "related" within the meaning of the Food Act.

The Food Act requires FDA to consider the cumulative effect of related chemicals as part of a determination of whether their use as food additives continues to be safe. 21 U.S.C. § 348(c)(5)(B). By retaining its authorizations for DINP, DEHP, and DCHP without considering the cumulative effect of these antiandrogenic Phthalate Additives, and the antiandrogenic phthalate DIOP, in the diet, FDA acted arbitrarily and contrary to the Food Act. *Id*. For this reason too, FDA's Order must be set aside. *See State Farm*, 463 U.S. at 43 (agency action is

"arbitrary and capricious if the agency … entirely failed to consider an important aspect of the problem ….."); *Cigar Ass'n*, 126 F.4th at 705 (concluding FDA decision was arbitrary and capricious where FDA "did not examine the relevant data" that was "at the heart of its inquiry" (quotation omitted)).

## IV.   FDA UNLAWFULLY DENIED PETITIONERS' HEARING REQUEST

### A.   The Food Act Mandates Hearings to Resolve Material Factual Disputes Raised by Objections

The Food Act permits "any person adversely affected by" FDA's order denying a food additive petition to "request[] a public hearing upon [their] objections." 21 U.S.C. § 348(f)(1). Upon receiving a hearing request, FDA "*shall* … as promptly as possible hold such public hearing for the purpose of receiving evidence relevant and material to the issues raised by such objections." *Id.* (emphasis added).

On its face, this provision "obligates [FDA] to hold a hearing and issue an order based on the record made at the hearing." *Nader v. EPA*, 859 F.2d 747, 753 (9th Cir. 1988); *see also Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011) (affirming that "'shall' is usually interpreted as the language of command" (quotation omitted)). Nonetheless, this Court has held that a hearing is "appropriate only where material objections to the FDA's actions exist." *Cmty. Nutrition Inst. v. Young*, 773 F.2d 1356, 1361 (D.C. Cir. 1985); *accord Pharm. Mfg. Rsch. Servs. v. FDA*, 957 F.3d 254, 266 (D.C. Cir. 2020). FDA's regulations further state that it

must convene a hearing if the objectors show: (1) "[t]here is a genuine and substantial issue of fact for resolution at a hearing"; (2) "[t]he factual issue can be resolved by available and specifically identified reliable evidence"; (3) "[t]he data and information submitted, if established at a hearing, would be adequate to justify resolution of the factual issue in the way sought by the person"; and (4) "[r]esolution of the factual issue in the way sought by the person is adequate to justify the action requested." 21 C.F.R. § 12.24(b).

While the Court's "review of an agency's decision to grant or deny a hearing is necessarily deferential," *Pharm. Mfg.*, 957 F.3d at 266 (quotation omitted), "[n]either due process nor the Administrative [Procedure] Act permits an arbitrary denial [of a hearing request] in any case where it can be fairly said there are genuine and substantial issues of fact in dispute," *Hynson, Westcott & Dunning, Inc. v. Richardson*, 461 F.2d 215, 220 (4th Cir. 1972) (quotation omitted), *aff'd, sub. nom. Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609 (1973).

### B. The Objections Raise Material Factual Issues Justifying a Hearing

Petitioners requested a hearing on their objections concerning whether the evidence presented on the Phthalate Additives' (1) toxicity, (2) exposures, and (3) cumulative effects creates significant questions about the Additives' safety. [FDA-009551-009552]; [FDA-009567-FDA-009568]; [FDA-009579]. These factual issues are material—indeed, central—to FDA's decision. Further, if FDA maintains

that the existing record does not justify revoking the Additives' approval under the correct legal standard, at a minimum that record reflects significant disputes regarding the conclusions supported by specific evidence and whether the totality of the evidence raises significant safety questions. *See, e.g.*, [FDA-000008-FDA-000009] (Order asserting that epidemiological studies are inappropriate for assessing Additives' safety and that Petitioners' presentation of toxicity studies "is not adequate to justify resolution in the objectors' favor of the factual question about safety of the still-authorized food additive uses"); [FDA-000014-FDA-000015] (Order asserting that exposure data is inadequate to "justify the factual determination about unsafe exposure" because of supposed deficiencies in analyses presented). In these circumstances, FDA lacked discretion to deny a hearing. 21 U.S.C. § 348(f)(1); *cf. Pharm. Mfg.*, 957 F.3d at 266 (holding that FDA may deny hearing request where the "proffered evidence create[s] no relevant factual dispute").

Further, FDA's justifications for denying a hearing are irrational. FDA asserted that a hearing is not justified because Petitioners' objections address the safety of the five Phthalate Additives that remain approved—not the 23 whose approval FDA revoked in 2022 in response to the industry abandonment petition—and therefore the objections do not justify the relief requested in the 2016 Food Additive Petition regarding the 28 phthalates approved at that time. [FDA-000009-

FDA-000010, FDA-000013-FDA-000014]. This is nonsensical. As explained above, Petitioners appropriately narrowed their arguments at the objections stage to focus on the five Phthalate Additives that remain approved. A hearing on the safety of the 23 phthalates that are no longer authorized for food-contact use would serve no purpose. Moreover, if FDA determined after a hearing that there is no longer a reasonable certainty of no harm from use of one or more of the five Phthalate Additives that remain approved, that would require FDA to alter its Order. Accordingly, a hearing was required. 21 U.S.C. § 348(f); 21 C.F.R. § 12.24(b).

Regarding Objection 8, which concerns whether the exposure evidence supports significant safety questions, FDA additionally asserted that a hearing was not justified because Petitioners purportedly failed to establish that dietary exposure to the Phthalate Additives exceeds safe levels. [FDA-000014] (citing 21 C.F.R. § 12.24(b)(3)). This rationale fails because, as explained *supra* Point II, Petitioners have no burden to prove that exposure exceeds safe levels and the Additives' use is therefore causing harm; instead, Petitioners properly sought to establish significant questions regarding the safety of exposure to the Additives. Moreover, FDA may not require Petitioners to establish the ultimate issue in the proceeding "as a predicate for securing [their] right to a hearing. If that were [their] burden, a hearing would never be necessary or appropriate." *Hynson*, 461 F.2d at 220.

## V.    REMEDY

FDA's decision to maintain its food-additive authorizations for the Phthalate Additives despite overwhelming evidence of their hazards and ubiquitous exposures driven by contaminated food is arbitrary and capricious and violates the Food Act and FDA's regulations. Further, FDA's decision to maintain those authorizations based on decades-old safety assessments that FDA has refused to update perpetuates an unconscionable delay in addressing a "serious public health problem of great magnitude." [FDA-010871] (Zota Declaration). Seventeen years after committing to update its safety assessments, FDA is still at the starting line, requesting more information that it "may" use to update its assessments in the future while arbitrarily dismissing the robust evidence presented in the eight-year petition proceeding that gave rise to this litigation.

"There comes a point when relegating issues to proceedings that go on without conclusion in any kind of reasonable time frame is tantamount to refusing to address the issues at all and the result is a denial of justice." *MCI Telecomms. Corp. v. FCC*, 627 F.2d 322, 344 (D.C. Cir. 1980) (quotation omitted). Given FDA's intransigence and the life-altering harm it is causing to children's health, the Court should "let [the] agency know, in no uncertain terms, that enough is enough." *Pub. Citizen Health Rsch. Grp. v. Brock*, 823 F.2d 626, 627 (D.C. Cir. 1987). Specifically, the Court should order FDA, within 60 days, to initiate

proceedings to revoke approval for the Phthalate Additives or notice a hearing on Petitioners' objections.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that this Court vacate FDA's Order and direct FDA to, within 60 days, initiate proceedings to revoke approval for the Phthalate Additives or notice a hearing on Petitioners' objections.

DATED: March 28, 2025

Respectfully submitted,

*/s/Katherine K. O'Brien*
KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, Maine 04116
(212) 284-8036
kobrien@earthjustice.org

LAKENDRA S. BARAJAS
KELLY E. LESTER
Earthjustice
48 Wall St., Floor 15
New York, New York 10005
(212) 284-8025
(332) 251-0243
lbarajas@earthjustice.org
klester@earthjustice.org

*Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 13,000 words, excluding those parts exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

I also certify that this document complies with the typeface requirements of Fed. R. App. 32(a)(5) and type style requirements of Fed. R. App. 32(a)(6) because it has been prepared in a proportionally spaced font using Microsoft Word Times New Roman 14-point font.

*/s/Katherine K. O'Brien*
KATHERINE K. O'BRIEN

**CERTIFICATE OF SERVICE**

I certify that on March 28, 2025, I electronically filed the foregoing document and its addendum with the Court's CM/ECF system, which will serve each party's counsel of record.

*/s/Katherine K. O'Brien*
KATHERINE K. O'BRIEN
