## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ALASKA COMMUNITY ACTION ON TOXICS, BREAST CANCER
PREVENTION PARTNERS, CENTER FOR ENVIRONMENTAL HEALTH,
CENTER FOR FOOD SAFETY, CENTER FOR SCIENCE IN THE PUBLIC
INTEREST, DEFEND OUR HEALTH, ENVIRONMENTAL DEFENSE FUND,
and LEARNING DISABILITIES ASSOCIATION OF ILLINOIS,
*Petitioners*,

v.

UNITED STATES FOOD AND DRUG ADMINISTRATION and DR. MARTIN
MAKARY, in his official capacity as Commissioner of the United States Food and
Drug Administration,
*Respondents.*

On Petition for Review of a Final Order of the Food and Drug Administration,
89 Fed. Reg. 86,290 (Oct. 30, 2024)

## PROOF REPLY BRIEF OF PETITIONERS

Dated: October 15, 2025

KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, Maine 04116
(212) 284-8036
kobrien@earthjustice.org          *(Additional counsel listed on next page)*

LAKENDRA S. BARAJAS
KELLY E. LESTER
Earthjustice
48 Wall St., Floor 15
New York, New York 10005
(212) 284-8025
(332) 251-0243
lbarajas@earthjustice.org
klester@earthjustice.org

*Counsel for Petitioners*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................... i

TABLE OF AUTHORITIES................................................... iii

GLOSSARY OF ABBREVIATIONS ..................................... vi

INTRODUCTION ................................................................1

STATUTES AND REGULATIONS ........................................2

SUMMARY OF ARGUMENT...............................................2

ARGUMENT ......................................................................3

I.   PETITIONERS HAVE STANDING .................................3

     A.   Petitioners' Members Face Substantial Health Risks, Which FDA's Order Substantially Increases .................................3

     B.   Efforts to Reduce Exposure to Phthalate Additives Support Petitioners' Standing ...........................................7

     C.   BCPP Has Standing ...........................................8

II.  FDA'S ORDER IMPOSED AN IMPROPER BURDEN ON PETITIONERS ........................................................9

     A.   FDA Addresses Arguments Petitioners Never Made............................10

     B.   FDA's Position Is Unsupported ...........................11

     C.   FDA's Position Contravenes Past Practice .............................14

III. FDA ARBITRARILY REJECTED EVIDENCE ESTABLISHING SIGNIFICANT SAFETY QUESTIONS ......................................15

     A.   FDA Invokes the Wrong Standard of Review ........................15

     B.   FDA Unlawfully Disregarded the Cumulative Effects of Antiandrogenic Phthalates in Food.................................15

     C.   FDA Arbitrarily Dismissed Petitioners' Toxicity Evidence ...................19

i

    D.  FDA's Dismissal of Petitioners' Exposure Evidence Is Arbitrary and Unlawful ................................................................................................25

IV.    PETITIONERS ARE ENTITLED TO A HEARING ....................................29

CONCLUSION ....................................................................................................31

CERTIFICATE OF COMPLIANCE......................................................................32

CERTIFICATE OF SERVICE .............................................................................33

# TABLE OF AUTHORITIES

**Cases**

*AARP v. EEOC*,
    226 F. Supp. 3d 7 (D.D.C. 2016) ........................................................9

*Air All. Houston v. EPA*,
    906 F.3d 1049 (D.C. Cir. 2018) ........................................................8

*Am. Farm Bureau Fed'n v. EPA*,
    559 F.3d 512 (D.C. Cir. 2009) .............................................. 25–26

*Am. Radio Relay League v. FCC*,
    524 F.3d 227 (D.C. Cir. 2008) ........................................................27

*Ass'n of Battery Recyclers v. EPA*,
    716 F.3d 667 (D.C. Cir. 2013) ........................................................7

*Attias v. Carefirst*,
    865 F.3d 620 (D.C. Cir. 2017) ........................................................3

*Bayala v. U.S. Dep't of Homeland Sec.*,
    827 F.3d 31 (D.C. Cir. 2016) ........................................................17

*Clean Wisc. v. EPA*,
    964 F.3d 1145 (D.C. Cir. 2020)........................................... 5, 6, 7

*County of Los Angeles v. Shalala*,
    192 F.3d 1005 (D.C. Cir. 1999) ............................... 21, 24, 26

*Ctr. for Biological Diversity v. EPA*,
    56 F.4th 55 (D.C. Cir. 2022) ........................................................5

*Elec. Privacy Info. Ctr. v. FAA*,
    892 F.3d 1249 (D.C. Cir. 2018) ........................................................4

*Entergy Ark. v. FERC*,
    134 F.4th 576 (D.C. Cir. 2025) ........................................................3

*Env't Health Trust v. FCC*,
    9 F.4th 893 (D.C. Cir. 2021) ........................................................22

*Flyers Rights Educ. Fund v. U.S. Dep't of Transp.*,
    957 F.3d 1359 (D.C. Cir. 2020) ........................................................8, 9

*Food & Water Watch v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ................................................ 4, 6, 7–8

*Hynson, Westcott & Dunning v. Richardson*,
    461 F.2d 215 (4th Cir. 1972)...............................................................30

*In re Idaho Conservation League*,
    811 F.3d 502 (D.C. Cir. 2016)...............................................................5

*In re Natural Resources Defense Council* ("*NRDC*"),
    645 F.3d 400 (D.C. Cir. 2011)...............................................................13

*League of United Latin Am. Citizens v. Regan* ("*LULAC*"),
    996 F.3d 673 (9th Cir. 2021) ...................................................... 13, 14

*Mountain States Legal Found. v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996) ...............................................................6

*Nat. Res. Def. Council v. EPA*,
    755 F.3d 1010 (D.C. Cir. 2014) ............................................................7

*Pharm. Mfg. Rsch. Servs. v. FDA*,
    957 F.3d 254 (D.C. Cir. 2020) .............................................................15

*Sierra Club v. EPA*,
    754 F.3d 995 (D.C. Cir. 2014) ..............................................................4

*Simpson v. Young*,
    854 F.2d 1429 (D.C. Cir. 1988) ..........................................................15

*Vanda Pharms. v. FDA*,
    150 F.4th 563 (D.C. Cir. 2025) ........................................... 29, 30, 31

**Statutes**

21 U.S.C. § 348(b)(2)(B) ...........................................................................12

21 U.S.C. § 348(c)(2)...................................................................................18

21 U.S.C. § 348(c)(5)...................................................................................17

21 U.S.C. § 348(c)(5)(B) ................................................................. 15, 16

21 U.S.C. § 348(f) ..............................................................................17

21 U.S.C. § 348(g)(2) ................................................................... 15, 17

21 U.S.C. § 348(i) ......................................................................... 12, 22

**Regulations**

21 C.F.R. § 12.22 ...............................................................................17

21 C.F.R. § 12.87(d) .................................................................... 13–14

21 C.F.R. § 12.100 .............................................................................17

21 C.F.R. § 171.1 ...............................................................................13

21 C.F.R. § 171.1(c) ..................................................................... 13, 22

21 C.F.R. § 171.1(c)(A) .....................................................................13

21 C.F.R. § 171.130 ..................................................................... 12, 13

21 C.F.R. § 171.130(b) ................................................................ 13, 22

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **ATSDR** | Agency for Toxic Substances and Disease Registry |
| **BCPP** | Breast Cancer Prevention Partners |
| **CPSC** | Consumer Product Safety Commission |
| **DAP** | Diallyl phthalate |
| **DCHP** | Dicyclohexyl phthalate |
| **DEHP** | Di-(2-ethylhexyl) phthalate |
| **DIDP** | Diisodecyl phthalate |
| **DINP** | Diisononyl phthalate |
| **DIOP** | Diisooctyl phthalate |
| **EPA** | United States Environmental Protection Agency |
| **FDA** | United States Food and Drug Administration |
| **Food Act** or **Act** | Federal Food, Drug, and Cosmetic Act |
| **Petition** | Food additive petition 6B4815 dated March 18, 2016 |
| **PFAS Additives** | Additives addressed in Indirect Food Additives: Paper and Paperboard Components, 81 Fed. Reg. 5 (Jan. 4, 2016) |
| **Phthalate Additives** or **Additives** | DAP, DCHP, DEHP, DIDP, DINP |
| **Order** | Env't Def. Fund, et al.; Response to Objections and Requests for a Public Hearing, 89 Fed. Reg. 86,290 (Oct. 30, 2024) |

**INTRODUCTION**

This Court should hold unlawful and vacate FDA's Order maintaining approval for food-additive uses of the phthalates DAP, DCHP, DEHP, DIDP, and DINP (the "Phthalate Additives"). FDA does not dispute that its authorizations cause phthalate contamination of the food supply and widespread exposure to these toxic chemicals.

FDA last assessed the Phthalate Additives' safety more than *40 years ago*, before scientists linked phthalate exposure to permanent harm to children's brain development, preterm birth, breast cancer recurrence, and serious adverse effects on the reproductive system in children and adults. Rather than update its assessments based on this robust body of new evidence, FDA critiques—often inaccurately—subsets of evidence and makes conclusory assertions that the record is insufficient to disturb decades-old FDA findings that never considered these effects. FDA's approach is irreconcilable with its statutory duties to conduct a reasoned assessment of the evidence and ensure food-additive safety.

FDA's continued authorization of the Phthalate Additives' use is exposing generations of children to chemicals that leading scientists and FDA's peer regulators have found pose unacceptable risks. The Court should vacate FDA's Order and direct it to revoke the Additives' approval or provide an evidentiary hearing on Petitioners' objections.

**STATUTES AND REGULATIONS**

Pertinent statutes and regulations appear in Petitioners' Brief.

**SUMMARY OF ARGUMENT**

Petitioners have standing. Petitioners' members and supporters consume foods contaminated with Phthalate Additives, and face substantial health risks, because of FDA's authorizations. FDA's attempts to impose additional requirements for standing in this context are unsupported. *Infra* Point I.

Though FDA recites the proper standard for petitions to revoke food-additive authorizations—which requires petitioners to establish significant *questions* regarding additives' safety—its Order improperly required Petitioners to prove the Phthalate Additives cause harm. FDA's new argument that Petitioners' evidence must be sufficient to compel the conclusion that the Additives are unsafe also unlawfully raises the standard. *Infra* Point II.

Even if FDA's articulation of Petitioners' burden were correct, the Order is unlawful. FDA violated the Food Act by refusing to consider the cumulative effects of related phthalates in food and arbitrarily rejected toxicity and exposure evidence that renders FDA's outdated safety findings unsustainable. *Infra* Point III.

Despite justifying its Order based on disagreements with Petitioners over the factual conclusions the evidence supports, FDA irrationally determined there are

no material factual disputes meriting a hearing. FDA's summary denial without a hearing violates the Food Act. *Infra* Point IV.

<h1 style="text-align:center">ARGUMENT</h1>

## I.    PETITIONERS HAVE STANDING

FDA acknowledges that increased risk of harm from agency action may constitute a cognizable injury. Initial Br. for Respondents ("FDA Br.") 16, Dkt. No. 2130033. This Court has "frequently upheld" standing based on increased risk, *Attias v. Carefirst*, 865 F.3d 620, 627 (D.C. Cir. 2017), where, as here, petitioners show their risk "is substantial and that the challenged action substantially increases" that risk, *Entergy Ark. v. FERC*, 134 F.4th 576, 583 (D.C. Cir. 2025) (quotation omitted).

### A.    Petitioners' Members Face Substantial Health Risks, Which FDA's Order Substantially Increases

Petitioners' members and supporters face substantial health risks because of FDA's Order. Proof Br. of Petitioners ("Pet'rs Br.") 19-20, Dkt. No. 2108342. They regularly consume foods in which Phthalate Additives are found. Pet'rs Br. 20; *see*, *e.g.*, Pet'rs' Addendum of Decls. at DEC077-081, Dkt. 2108342 (describing Petitioner's investigation of Additives' presence in food and food-contact materials, including study reporting DEHP in 100% of tested milk, vegetable oil, and other foods, and DINP in nearly 25% of tested foods); DEC063-064 (describing member's consumption of cooking oil and approximately one

gallon of milk weekly); DEC050 (describing member's consumption of cooking oils, cheese, and other dairy products). These individuals face substantial health risks from dietary exposure to the Phthalate Additives, including cancer and harm to brain and reproductive development, DEC043, DEC098, DEC121-23, which studies and expert analyses in the record substantiate, Pet'rs Br. 35-37; [FDA-010658-FDA-010660]; [FDA-010708-FDA-010718]; [FDA-000383]. FDA cites no authority for the proposition that these exposures and health harms are insufficiently specific. FDA Br. 17-20.

Petitioners' standing thus does not depend on speculation about future exposure, which distinguishes the cases on which FDA relies. *See id.* at 16, 19. For example, in *Food & Water Watch v. Vilsack*, plaintiffs claimed a new poultry-inspection process might allow more adulterated poultry into the market—a premise the Court found unsupported—which might expose plaintiffs to pathogens and cause illness. 808 F.3d 905, 915-18 (D.C. Cir. 2015); *see also Elec. Privacy Info. Ctr. v. FAA*, 892 F.3d 1249, 1254 (D.C. Cir. 2018) (plaintiff lacked standing where it was speculative whether challenged action would increase allegedly harmful drone use); *Sierra Club v. EPA*, 754 F.3d 995, 1000-01 (D.C. Cir. 2014) (plaintiffs lacked standing where plaintiffs "speculate[d]" that challenged action could increase pollution). Here, FDA's Order causes Petitioners' members and supporters to experience *ongoing* exposure to Phthalate Additives.

Further, FDA's Order substantially increases the risks this ongoing exposure presents. FDA does not dispute that its decision maintaining the Phthalate Additives' approvals causes their presence in food, nor that diet is the primary exposure route for multiple Phthalate Additives. Pet'rs Br. 45-46. Accordingly, there is a "substantial probability" that vacating FDA's decision "will reduce the injuries" to Petitioners' members and supporters. *In re Idaho Conservation League*, 811 F.3d 502, 512 (D.C. Cir. 2016) (organization had standing to challenge EPA's failure to promulgate regulations ensuring timely mine cleanups where such rules would "limit [petitioner's member's] exposure to" hazardous materials); *contra* FDA Br. 20.

FDA's attempts to heighten the requirements for establishing substantial risk lack support. First, FDA dismisses Petitioners' health concerns as "subjective" and inadequate to establish imminent risks. FDA Br. 18-19. However, the declarants' specific health concerns are supported by record evidence cited in Petitioners' declarations and brief. *E.g.*, Pet'rs Br. 35-37; DEC086-094; *see Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 67 (D.C. Cir. 2022) (affirming that Court considers declarations and administrative record in evaluating standing). This evidence is not subjective, and it establishes "realistic health concerns." *Clean Wisc. v. EPA*, 964 F.3d 1145, 1156 (D.C. Cir. 2020).

Second, FDA incorrectly suggests Petitioners lack standing because some declarants recognize that additional chemicals may contribute to their health risks. FDA Br. 18, 20. "[T]he presence of other causal factors" does not defeat standing where "the incremental risk [from the challenged factor] is enough of a threat of injury to entitle plaintiffs to be heard." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1235 (D.C. Cir. 1996). And even "relatively modest increments of risk" suffice for severe risks, *id.*, such as cancer, DEC018, DEC065, DEC121-23.

Third, FDA cites no authority for the proposition that Petitioners must "quantify" or otherwise establish the "magnitude of the risks they claim to face from dietary exposure" to Phthalate Additives. FDA Br. 19-20. This Court has "refused to require a quantitative analysis" or "statistics" "to establish standing in increased-risk-of-harm cases." *Food & Water Watch*, 808 F.3d at 917. "[E]ven a small probability of injury is sufficient to create a case or controversy," *Mountain States*, 92 F.3d at 1234 (quotation omitted), and "[a]dverse health effects … constitute Article III injuries, even if a petitioner merely asserts realistic health concerns instead of providing medical evidence." *Clean Wisc.*, 964 F.3d at 1156.

Petitioners' declarations and record evidence substantiate such "realistic health concerns." *Id.* For example, Breast Cancer Prevention Partners ("BCPP") supporter Debra Cole regularly consumes foods in which Phthalate Additives are found. DEC018 (describing consumption of chicken, cheese, spices, and cooking

6

oils); DEC078-81, DEC086-94 (describing testing detecting phthalates in these foods, including DEHP, DINP, and DCHP in oils and DEHP and DINP in cheese). Ms. Cole is a breast cancer survivor concerned about "the possibility of breast cancer recurrence due to exposure to endocrine-disrupting chemicals" like DEHP, DEC018, which research links to breast cancer recurrence and poor survival in breast cancer patients, Pet'rs Br. 36-37; [FDA-010270]. Ms. Cole's "realistic health concern[]" arising from her breast cancer history and ongoing exposure to Phthalate Additives in food due to FDA's Order is a cognizable injury. *Clean Wisc.*, 964 F.3d at 1156.

### B. Efforts to Reduce Exposure to Phthalate Additives Support Petitioners' Standing

Petitioners' members' and supporters' efforts to avoid specific foods to reduce exposures to Phthalate Additives also support Petitioners' standing. *Contra* FDA Br. 20-21. This Court has repeatedly held that individuals avoiding customary activities to reduce chemical exposure supports standing to challenge actions generating that exposure. *See Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1016-17 (D.C. Cir. 2014) (holding organizations established standing to challenge action authorizing pollution where declarants reduced time outdoors due to pollution-exposure concerns); *Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 672 (D.C. Cir. 2013) (same). In contrast, in *Food & Water Watch* the Court held that the declarants' actions to avoid contaminated chicken did not support standing because

their risk of food-borne illness hinged on an attenuated chain of speculation not present here. 808 F.3d at 919.

### C. BCPP Has Standing

Since other Petitioners are traditional membership organizations whose members experience substantial health risks from FDA's Order, DEC055, DEC114, DEC107, DEC069, the Court need not reach BCPP's standing. *Air All. Houston v. EPA*, 906 F.3d 1049, 1058 (D.C. Cir. 2018).[1]

Regardless, FDA's attack on BCPP's standing lacks merit because BCPP is "the functional equivalent of a traditional membership organization." *Flyers Rights Educ. Fund v. U.S. Dep't of Transp.*, 957 F.3d 1359, 1361 (D.C. Cir. 2020) (quotation omitted). In assessing functional equivalence, this Court considers whether supporters "guid[e]" and "financ[e]" the organization's activities. *Id.* at 1361-62.

BCPP's supporters guide its activities: They "shape and influence" its work, including by "bringing their concern with a particular chemical or product to" BCPP's attention. DEC025; *see also* DEC017 (BCPP supporter attesting she confers with BCPP staff regularly and her priorities inform its work). And BCPP supporters finance its activities, providing approximately 40% of BCPP's annual

---

[1] Traditional membership organizations need not establish "indicia of membership." *Students for Fair Admissions v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 201 (2023). *Contra* FDA Br. 15.

8

budget, DEC025. *See AARP v. EEOC*, 226 F. Supp. 3d 7, 17 (D.D.C. 2016) (finding "indicia of membership" where dues provided 19% of organization's revenue). Indeed, BCPP declarant Debra Cole has raised more than $900,000 for BCPP. DEC016. In sum, "there is a sufficient amount of interaction" between BCPP and its supporters for BCPP to sue on its supporters' behalf. *Flyers Rights*, 957 F.3d at 1362.

## II. FDA'S ORDER IMPOSED AN IMPROPER BURDEN ON PETITIONERS

FDA recites the correct standard for revocation petitions: They must provide "sufficient data to establish the existence of safety questions significant enough to support a finding that there is no longer a reasonable certainty of no harm" from additives' approved uses. FDA Br. 22 (quoting Petition denial); *see* Pet'rs Br. 9-10. But that is not the standard FDA's Order applied. Instead, FDA imposed on Petitioners the burden of proving the Additives *cause harm* under their approved conditions of use. Pet'rs Br. 23-24, 26-27; *see* FDA Br. 21-32 (not disputing this characterization); FDA Br. 55 (asserting Petitioners' evidence is inadequate because it purportedly does not prove Additives' use "result[s] in unsafe levels of exposure").

FDA's brief compounds this error by insisting Petitioners must "prove[] there are such significant safety questions concerning [an additive's] use that it *can no longer be concluded* that the use has a reasonable certainty of no harm." FDA

Br. 26 (emphasis added); *see also id*. at 42. FDA's standard contravenes the Food Act and FDA's regulations. Revocation petitioners need not submit evidence *compelling* the conclusion that a use no longer has a reasonable certainty of no harm. Rather, if petitioners establish safety questions that support that finding, FDA must rationally dispel those questions or revoke approval. *See* [FDA-002005] (Petition denial).

Instead of confronting Petitioners' arguments, FDA invents a parade of horribles following from positions Petitioners never advanced and invokes statutory and regulatory provisions that do not support FDA's position.

## A.    FDA Addresses Arguments Petitioners Never Made

FDA's assertion that Petitioners' position would "grind [FDA] to a halt" rests on mischaracterization. FDA Br. 22-23.

Petitioners never argued that FDA should have required the original petitioning companies "to prove all over again" in this proceeding "that the phthalates at issue are safe." *Id.* at 22. Instead, Petitioners invoked the Food Act's presumption that additives are unsafe unless their proponents prove they are safe and argued that requiring revocation petitioners to prove that additives cause harm contravenes that statutory framework by allowing additives with unresolved safety questions to remain in commerce. Pet'rs Br. 24-26; [FDA-009539] (objections).

FDA also claims repeatedly that Petitioners' position would require FDA to repeal an authorization or conduct a "full de novo [safety] reassessment" whenever petitioners provide "any quantum of 'new information' … supposedly raising significant safety questions"—even a single study of questionable merit. FDA Br. 12, 23; *see also id.* at 22 n.5, 25-26, 31. Petitioners never made that argument either. Instead, revocation petitioners must provide evidence establishing safety questions "significant enough to support a finding that there is no longer a reasonable certainty of no harm." Pet'rs Br. 9-10 (quotation omitted); *see also id.* at 26. Only then must FDA rationally affirm the additive's safety or initiate revocation. Petitions based on one low-quality study would not require a comprehensive reassessment under this standard.

Nor does FDA's hypothetical bear any resemblance to the record. Petitioners presented hundreds of scientific studies, agency assessments, and expert declarations, which collectively establish serious health risks from consuming Phthalate Additives. *See id.* at 34-37, 45-46. This is a far cry from submitting "*a new publication*" reporting "toxic effects." FDA Br. at 23, 23 n.6 (emphasis added).

## B.    FDA's Position Is Unsupported

FDA fails to support its assertion that revocation petitioners must "prove[] … that it can no longer be concluded that [a food additive's] use has a reasonable

certainty of no harm," *id.* at 26, rather than establish safety questions that could support that finding.

1.      FDA cites 21 U.S.C. § 348(i) to assert that revocation petitioners must provide the same data and bear the same burden of proof on safety as companies seeking approval. FDA Br. 22, 25. But section 348(i) merely directs FDA to establish a "procedure" for repealing food-additive regulations that "conform[s] to" the procedure for promulgating them, 21 U.S.C. § 348(i); it says nothing about substantive requirements for revocation petitions.

Further, multiple requirements for authorization petitions are facially inapplicable to revocation petitions. For example, authorization petitions must include directions for an additive's use, "including … proposed labeling." *Id*. § 348(b)(2)(B). Such information would make no sense in petitions to end an additive's use.

2.      FDA's regulations also do not support its argument that all substantive requirements for authorization petitions apply to revocation petitions. FDA Br. 27-28. The provision governing revocation petitions, 21 C.F.R. § 171.130, prescribes the information required in such petitions: "an assertion of facts, supported by data, showing that new information exists with respect to the food additive …, that new data are available as to toxicity of the chemical, or that experience with the existing regulation … may justify its amendment or repeal."

Section 171.130(b)'s directive that "[n]ew data" "be furnished in the form specified in [section] 171.1," does not mean revocation petitions must also contain all data section 171.1 requires for authorization petitions. *Contra* FDA Br. 27-28. Section 171.1 distinguishes between required data and the form it must take. 21 C.F.R. § 171.1(c). And many of section 171.1's data requirements are facially inapplicable to revocation petitions. *See, e.g.*, *id.* § 171.1(c)(A) (requiring petitioners to "identify each person" who will conduct the "manufacturing, processing, and packing operations for a food additive").[2]

3. FDA's position is not supported by any "default distribution of burdens." FDA Br. 26-27. Consistent with the Food Act's health-protective purpose, Pet'rs Br. 25; *League of United Latin Am. Citizens v. Regan ("LULAC")*, 996 F.3d 673, 691 (9th Cir. 2021), FDA's regulations displace "default" burdens in hearings involving revocation of food-additive regulations. Instead, "the participant who is contending that [a food additive] is safe … and … contesting

---

[2] FDA misleadingly quotes *In re Natural Resources Defense Council* ("*NRDC*"), 645 F.3d 400 (D.C. Cir. 2011), claiming this Court "explained" that, under sections 171.1 and 171.130, "the petitioner bears the burden of establishing that an additive is safe or unsafe." FDA Br. 28 (citation modified). This Court never said that. Rather, the Court observed that petitioners seeking food-additive *approval* "bear[] the burden of showing that the additive … 'will be safe,'" *NRDC*, 645 F.3d at 403 (quotation omitted), while a party filing a "citizen petition"—a separate procedure not at issue here—"does not bear the burden of establishing that an additive is safe or unsafe," *id.* The Court did not address the burden on petitioners seeking revocation of food-additive regulations.

withdrawal of approval has the burden of proof in establishing safety." 21 C.F.R. § 12.87(d). FDA suggests this applies only when FDA issues revocation orders and someone objects. FDA Br. 28-29. But the regulation applies to any hearing "involving" revocation of food-additive regulations, 21 C.F.R. § 12.87(d), and is "illustrative" even when FDA denies a hearing, *LULAC*, 996 F.3d at 695.[3]

## C. FDA's Position Contravenes Past Practice

FDA's Order is inconsistent with its decision revoking approval for the PFAS Additives. *Contra* FDA Br. 29-31. There, FDA correctly (1) determined whether available information "raises significant [safety] questions"; (2) considered whether FDA had sufficient data "to address these questions"; and (3) "in the absence" of such data, concluded there is no longer a reasonable certainty of no harm and revoked approval. [FDA-009083].

Here, in contrast, FDA required Petitioners to fulfill FDA's role by "answer[ing] the question of whether specific … uses" of the Phthalate Additives "[are] safe." [FDA-00014] (Order); *see also* FDA Br. 26, 42. This approach is inconsistent with FDA's PFAS Additives decision and the Food Act.

---

[3] FDA's attempt to distinguish *LULAC*, FDA Br. 29, ignores FDA's continuing obligation to ensure food additives' safety, Pet'rs Br. 29, n.8. Moreover, *LULAC* interpreted EPA regulations—which are substantively identical to FDA's— independent from the statutory language on which FDA's argument rests. *See LULAC*, 996 F.3d at 695 (explaining dissent's reading of burden allocation contravenes *both* statutory requirement for leaving tolerances in effect *and* regulations).

## III.  FDA ARBITRARILY REJECTED EVIDENCE ESTABLISHING SIGNIFICANT SAFETY QUESTIONS

### A.  FDA Invokes the Wrong Standard of Review

FDA incorrectly invokes the standard of review in 21 U.S.C. § 348(g)(2), FDA Br. 14, omitting language stating FDA's factual findings shall be sustained if based on a fair evaluation of the record "at [a] hearing." 21 U.S.C. § 348(g)(2). That standard, and its explication in *Simpson v. Young*, 854 F.2d 1429 (D.C. Cir. 1988), are inapplicable because FDA summarily denied Petitioners' objections without a hearing. The Food Act articulates no standard of review for such circumstances, so the Court applies the Administrative Procedure Act's ("APA") arbitrary-and-capricious standard. *See Pharm. Mfg. Rsch. Servs. v. FDA*, 957 F.3d 254, 260, 262 (D.C. Cir. 2020) (applying APA standard to FDA's denial of drug application); Pet'rs Br. 22.

### B.  FDA Unlawfully Disregarded the Cumulative Effects of Antiandrogenic Phthalates in Food

Even if FDA's articulation of Petitioners' burden were correct, which it is not, FDA's Order is unlawful. FDA does not dispute that, in determining whether there remains a reasonable certainty of no harm from food additives' use, FDA must consider cumulative effects—the health risks an additive presents in combination with other "chemically or pharmacologically related … substances" in food. 21 U.S.C. § 348(c)(5)(B). FDA does not dispute that DEHP, DINP, DCHP, and DIOP—which remain approved for food-contact use—are "related

substance[s]." *Id.*; *see* Pet'rs Br. 52-56; FDA Br. 34-40. These four phthalates are structurally similar; have antiandrogenic effects, meaning they suppress testosterone production; and cause permanent malformations of the male reproductive system. Pet'rs Br. 52-53; [FDA-009565-FDA-009566]. FDA does not dispute that it failed to consider these phthalates' cumulative effects in response to Petitioners' objections. This violates the Food Act and necessitates vacatur. 21 U.S.C. § 348(c)(5)(B).

FDA's only response is that Petitioners supposedly were procedurally barred from advocating for consideration of these antiandrogenic phthalates' cumulative effects in their objections because Petitioners' 2016 Petition advanced a broader cumulative effects argument encompassing 28 phthalates approved at that time. FDA Br. 34-40; [FDA-000012]. FDA ignores that it mooted Petitioners' broader cumulative effects argument by revoking approval for 23 of those phthalates before Petitioners filed their objections. Petitioners' objections properly narrowed their cumulative effects argument to address related phthalates that remain approved. FDA's failure to address that argument violates the Food Act.

1.      Since 2016, Petitioners have consistently requested the same action: that FDA revoke all active food-additive authorizations for phthalates. *See* FDA-012416 (petition); [FDA-009533-FDA-009535] (objections); Pet'rs Br. 10-11, 15. Petitioners' objections logically narrowed their cumulative effects argument to

focus on related phthalates that remain approved. *See* Pet'rs Br. 15, 54. FDA's

assertion that Petitioners' objections "sandbag[ged]" FDA by purportedly

"proposing a new [agency] action" confuses requests for agency action with the

rationale for such requests. FDA Br. 36, 38. Identifying related chemicals for

cumulative effects analysis is not an agency action; it is an analytical step the Food

Act requires before FDA acts on food additive petitions. 21 U.S.C. § 348(c)(5).[4]

FDA elides the absurdity of its theory that Petitioners' objections should

have advocated for FDA to consider the cumulative effects of 23 phthalates for

which FDA had already revoked approval. Indeed, the Court would lack

jurisdiction to review any claims regarding the validity of those revoked

authorizations because such claims are moot. *See, e.g., Bayala v. U.S. Dep't of

Homeland Sec.*, 827 F.3d 31, 34 (D.C. Cir. 2016) (agency granting requested relief

mooted claim).

2.      Petitioners' approach complies with the Food Act, which permits

record expansion in objections and at hearings. *See* 21 U.S.C. § 348(f), (g)(2); *see

also* 21 C.F.R. §§ 12.22, 12.100. Accordingly, FDA never disputed that Petitioners'

objections properly included substantial new evidence—including dozens of new

studies and a "new exposure analysis." FDA Br. 38 (quotation omitted).

---

[4] Moreover, Petitioners consistently asserted since the 2016 Petition that DEHP, DINP, DCHP, and DIOP present cumulative risks because of their known or suspected antiandrogenic effects. *See, e.g.*, [FDA-012458-FDA-012460].

3. In evaluating Petitioners' objections, FDA considered *sua sponte* whether five phthalates with active food-additive authorizations are related, which is irreconcilable with FDA's position that the only cumulative effects argument preserved for Petitioners' objections concerned the group of 28 addressed in the 2016 Petition. *See* Pet'rs Br. 54-55. But FDA arbitrarily ignored Petitioners' actual argument, which is that *three* of those five phthalates plus DIOP (which remains approved via "prior sanction") are related based on their antiandrogenic effects. *Id.* Petitioners' argument is as much "within the scope of the underlying petition" as the five-phthalate argument FDA invented and rejected. FDA Br. 38-39.

4. Petitioners' approach does not impose unmanageable burdens on FDA or conflict with the statute. *Contra id.* at 35-37.

Petitioners never suggested FDA must evaluate all possible groupings of two or more phthalates. *Contra id*. at 38. Petitioners' objections addressed FDA's error of addressing only the moot question of whether the 28 phthalates approved in 2016 are related, and the objections proposed three specific groupings of still-approved phthalates for FDA's evaluation. [FDA-009556-FDA-009568].

FDA's suggestion that it had insufficient time to consider these arguments, FDA Br. 35-36, strains credulity. FDA spent over two years evaluating Petitioners' objections, *see* [FDA-009531]; [FDA-000001]—more than four times longer than the Act allows for deciding underlying petitions, 21 U.S.C. § 348(c)(2).

FDA's assertion that Petitioners' approach would compel FDA "to entertain new proposed actions at the objections phase … without the benefit of a fully-developed record," FDA Br. 36, is equally baseless. Petitioners' objections did not seek new agency actions. And if further record development were necessary, the appropriate response would be convening the hearing the Food Act requires. *See infra* Point IV.

### C. FDA Arbitrarily Dismissed Petitioners' Toxicity Evidence

FDA does not dispute that its decades-old safety determinations for the Phthalate Additives do not account for life-altering health harms associated with those chemicals that are documented in studies Petitioners provided—including harm to children's brain development and preterm birth. *See* Pet'rs Br. 35-37. Nor does FDA dispute that these studies show the Additives are toxic at substantially lower levels than FDA understood when it approved them. *See id.* at 36. FDA's insistence that these major gaps in its analyses are irrelevant because "FDA's original actions authorizing … the five subject phthalates are not under review here," FDA Br. 46-47, only underscores the irrationality of FDA's position. *Contrast id.* at 22 (framing dispositive question as whether "FDA's original safety determination is no longer justified" based on new evidence).

Against this backdrop, FDA's flyspecking subsets of Petitioners' toxicity evidence is unavailing. FDA repeatedly mischaracterizes the evidence and legal

standard and provides no reasoned basis for rejecting epidemiological evidence that experts and other regulators have determined is integral to assessing phthalates' safety.

1.      FDA repeatedly mischaracterizes Petitioners' toxicity evidence to portray it as "inadequate." *Id*. at 43. For example, FDA incorrectly claims Petitioners' toxicity arguments rest on dose-response studies evaluating mixtures of Phthalate Additives and additional substances, which purportedly make it impossible to attribute toxic effects to the Additives. *Id*. at 43-44. But the papers FDA criticizes discuss multiple studies, including dose-response studies of *individual* Phthalate Additives. *See* [FDA-012983] (paper cited at FDA Brief 43 "characteriz[ing] the dose-response effects of six individual phthalates," including DEHP); [FDA-011795-FDA-011796] (paper discussed in FDA Brief 43-44 providing individual dose-response data for DEHP and DINP). FDA does not acknowledge this individual dose-response data, much less provide a basis for discounting it.

FDA fares no better in arguing that it reasonably dismissed toxicity studies addressing a single Phthalate Additive (DEHP) because those studies do not also assess the other Additives' toxicity. FDA Br. 44. FDA erroneously suggests Petitioners relied solely on DEHP studies, but Petitioners' objections provided toxicity evidence for all five Additives, *see* [FDA-009548-FDA-009549]; [FDA-

009562-FDA-009563]; [FDA-009565-FDA-009566] (discussing evidence for DINP, DCHP, DIDP, DEHP, and DAP). Further, the DEHP studies are indisputably relevant to assessing DEHP's safety, which is a central issue in this proceeding.

FDA offers no justification for disregarding the extensive dose-response data for DEHP in the Agency for Toxic Substances and Disease Registry's ("ATSDR") assessment. Pet'rs Br. 38. FDA instead makes a misleading assertion about ATSDR's *exposure* findings, claiming they support FDA because ATSDR stated that estimated general population exposure to DEHP is below levels that elicited adverse effects in animal studies. FDA Br. 45; [FDA-000014]. FDA ignores that ATSDR determined DEHP exposure in the U.S. exceeds the level at which DEHP may harm *humans*, which is the relevant benchmark. Pet'rs Br. 48.

In sum, FDA's explanations for dismissing Petitioners' toxicity evidence "run[] counter to the evidence before the agency." *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (citation modified). And FDA's mischaracterizations provide ample reason to doubt that FDA reasonably assessed the many studies FDA never discussed in the Order or record. *See* Pet'rs Br. 40. Indeed, the Court could only guess at FDA's rationale for dismissing these studies, which itself renders FDA's Order deficient. *See Los Angeles*, 192 F.3d at 1021 (court must "ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action" (citation modified)).

2.     FDA claims it properly rejected Petitioners' objections because Petitioners purportedly failed to explain how FDA could use the toxicity evidence to "perform[] an adequate risk assessment." FDA Br. 43. But FDA does not explain what constitutes an "adequate risk assessment" or what further explanation petitioners must provide, let alone ground its undefined standards in the Food Act or FDA's regulations. FDA's "conclusory and unexplained statement[s]" that Petitioners' presentation of toxicity evidence is inadequate fall short of "the reasoned explanation required by the APA." *Env't Health Trust v. FCC*, 9 F.4th 893, 909 (D.C. Cir. 2021) (quotation omitted).

Neither the Act nor FDA's regulations require Petitioners to give FDA directions for how to use each piece of evidence to assess safety. The Act directs FDA to promulgate regulations governing revocation petitions, 21 U.S.C. § 348(i), and those regulations require revocation petitions to provide "an assertion of facts, supported by data, showing that new information exists with respect to the food additive" or "that new data are available as to toxicity of the chemical," 21 C.F.R. § 171.130(b). FDA does not dispute that Petitioners satisfied these requirements.

The requirement that petitions seeking *approval* of food additives include "[f]ull reports of investigations made with respect to the [additive's] safety," *Id.* § 171.1(c), does not support FDA's position. *Contra* FDA Br. 53-54. Even assuming this requirement applied to revocation petitions, Petitioners satisfied it.

Petitioners provided, and summarized key findings from, hundreds of peer-reviewed studies investigating the Phthalate Additives' safety and analyses of the toxicity and exposure evidence by other regulatory bodies. *E.g.*, [FDA-009547-FDA-009549]; [FDA-009562-FDA-009566]. Petitioners also discussed and provided declarations from leading experts in phthalates' health effects who reviewed the scientific literature, synthesized that literature and their own research, and concluded that FDA's food-additive authorizations for phthalates are harming health in the U.S. [FDA-009550-FDA009551]; [FDA-010697-FDA-010848]; [FDA-010849-FDA-010944]. FDA has not disputed these expert analyses, explained what more they think Petitioners should have said about them or other toxicity evidence, or grounded FDA's insistence that Petitioners say more in the statute or regulations.

3.      Although FDA acknowledges that "epidemiological studies may be considered supplementary to the available toxicological data," *i.e.*, animal studies, FDA Br. 49 (quoting Order), it arbitrarily rejected Petitioners' reliance on epidemiological studies in precisely that manner. Petitioners never asserted that epidemiological studies alone "provide primary or sufficient basis for performing a risk assessment." *Id.* (quoting Order). But they are a critical component of the evidence on phthalates' health effects and must be considered in tandem with animal studies. *See* FDA-010717 (expert declaration discussing role of

epidemiological studies in revealing link between phthalates and male reproductive harm); [FDA-010708] (expert explaining that "epidemiologic studies ha[ve] linked exposure to phthalates at levels experienced by the general population with long-term or irreversible adverse health effects").

Accordingly, authorities like the CPSC's expert panel on phthalates have utilized epidemiological studies to assess phthalates' risks. [FDA-001443]. FDA nonsensically dismisses the panel's reliance on epidemiological studies because CPSC operates under different statutory authority and utilized the panel's findings to regulate children's products, not food additives. FDA Br. 50. Those distinctions have no bearing on the relevance of epidemiological studies, which associate phthalate exposure at real-world levels with specific health harms. [FDA-010708]. Those associations are equally relevant to determining whether phthalates pose health risks in children's products or food.

FDA fares no better in attempting to square its rejection of epidemiological studies with its past reliance on epidemiological studies to conclude that DEHP poses unacceptable health risks when used in certain pharmaceuticals. FDA Br. 50-51. Whether FDA is addressing DEHP's risks in pharmaceuticals or food has no bearing on the relevance of epidemiological studies. *See Los Angeles*, 192 F.3d at 1022 ("[A]gency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently" (citation modified)).

Ultimately, FDA's unsupported critiques of Petitioners' toxicity evidence do not support FDA's summary denial of Petitioners' objections. *See Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 525 (D.C. Cir. 2009) (overturning agency decision that "too hastily discounted" studies that "indicate[d] a significant public health risk" when "viewed together in the context of" the entire record).

### D. FDA's Dismissal of Petitioners' Exposure Evidence Is Arbitrary and Unlawful

FDA does not dispute that Petitioners provided multiple assessments concluding that food is the primary source of exposure to Phthalate Additives, indicating that the Additives' health risks are driven by FDA's authorizations. Pet'rs Br. 4, 45-46. This evidence, in combination with Petitioners' toxicity evidence, establishes significant safety questions.

1. FDA's exposure arguments fail because they rest on the unsupported theory that Petitioners must prove "that the specific food additive uses of the five subject phthalates result in unsafe levels of exposure." FDA Br. 55 (citation modified); *see also id.* at 52-54. FDA identifies no statutory or regulatory basis for requiring Petitioners to quantify exposures from the Phthalate Additives' uses, *see id.* at 52-54, and FDA revoked approval for the PFAS Additives despite lacking "data to determine dietary exposure," [FDA-009083]. Nor does FDA explain what exposure analysis it believes the statute or regulations require, which "deprive[s] the [FDA's] decisionmaking of a reasoned basis." *Am. Farm Bureau Fed'n*, 559

F.3d at 530 (holding air quality standard lacked reasoned basis where EPA failed to define level of protection statute required).

2.    In attempting to distinguish its decision revoking approval for the PFAS Additives, FDA mischaracterizes that decision. FDA asserts that the record supporting that decision "contained 'adequate migration data to determine dietary exposure to the relevant substances, and sufficient data to account for a consumer's systemic exposure resulting from chronic dietary exposure to those substances.'" FDA Br. 54 (alterations omitted) (quoting [FDA-009083]). But the decision says the opposite. FDA concluded that the PFAS Additives no longer meet the statutory safety standard "*in the absence of* … adequate migration data to determine dietary exposure." FDA-009083 (emphasis added); *see also id.* (explaining that, in deciding whether to revoke authorization, FDA evaluated "whether new data are available as to the *toxicity*" of the PFAS Additives "that justify" revocation (emphasis added)). Beyond grossly mischaracterizing the record, FDA fails to justify "treating [these] similar situations differently," rendering its decision arbitrary. *Los Angeles*, 192 F.3d at 1022 (quotation omitted).

3.    FDA rehashes its contention that it reasonably dismissed the CPSC panel's findings because its assessment "was not designed to assess the safety of food additive uses." FDA Br. 55 (quotation omitted). This argument ignores the panel's findings that *food specifically* is the primary source of exposure to at least

26

DEHP, DINP, and DIDP for high-risk populations. [FDA-001424-FDA-001425, FDA-001433, FDA-001762]. FDA fails to explain why it matters that the CPSC utilized those findings to support banning phthalates in children's products. *See Am. Radio Relay League v. FCC*, 524 F.3d 227, 241 (D.C. Cir. 2008) (agency's explanation for rejecting data must "provide[] … assurance that the [agency] considered the relevant factors").

4.    FDA's attempt to dismiss the CPSC panel's exposure findings because they incorporated data from the United Kingdom is not persuasive. FDA Br. 55. While acknowledging that these data were from abroad, the panel determined they were "the most recently reported food residues available," [FDA-001748], and came from a study "of high quality," [FDA-001779]. FDA's flyspecking is inadequate to undermine the panel's conclusions, which are consistent with other evidence in the record. *See* Pet'rs Br. 45-46.

5.    FDA mischaracterizes ATSDR's exposure findings. Reinforcing the CPSC panel's conclusion that high-risk populations are exposed to unsafe levels of Phthalate Additives in food, ATSDR concluded that exposure to DEHP alone exceeds safe levels and comes primarily from food. *See* [FDA-000374] (discussing exposure sources); [FDA-000386] (identifying 0.1 µg per kilogram of body weight daily as threshold for health risks from intermediate-duration oral exposure); [FDA-000756] (estimating substantially higher DEHP exposures in U.S.—between

27

5.0-25.8 μg per kilogram of body weight daily depending on age). FDA ignores this analysis in asserting that ATSDR "made no such comparison." FDA Br. 56; *see* [FDA-000862] (explaining ATSDR's "minimal risk level" reflects exposure level likely to pose no appreciable risks).

FDA also incorrectly asserts that ATSDR's calculation of the exposure level above which DEHP poses risks rests on "a single study that used only one dose level and only a limited number of animals." FDA Br. 56-57 (quotation omitted). In fact, ATSDR's calculation—which was subject to intra- and inter-agency review, external peer review, and public comment, [FDA-000366]; [FDA000863]— considered the full database of available toxicological studies assessing oral exposure to DEHP in experimental animals, *see* [FDA-000384] (explaining that ATSDR scientists determined this body of evidence was adequate to derive the cited health-risk level).

6.    FDA fails to rehabilitate its rejection of biomonitoring data—which measures chemicals in human blood or urine—to characterize exposure. FDA Br. 57-58. FDA has no answer to the common-sense point that biomonitoring data measuring exposure to Phthalate Additives from all sources is relevant for characterizing dietary exposure given the undisputed evidence that dietary exposure generally dominates total phthalate exposure. *See* Pet'rs Br. 48-49. Further, FDA ignores that the CPSC panel also estimated exposure using modeling,

which supported the same conclusion that dietary exposure drives total exposure. *Id.* at 49.

## IV. PETITIONERS ARE ENTITLED TO A HEARING

FDA fails to justify denying a hearing on Petitioners' objections. FDA argues that Petitioners' evidence did not support resolving key "factual question[s]" in Petitioners' favor. [FDA-000008, FDA-000014-FDA-000015]. Such "dispute[s] over the strength of the scientific evidence" necessitate a hearing. *Vanda Pharms. v. FDA*, 150 F.4th 563, 572 (D.C. Cir. 2025) (addressing analogous hearing requirements for drug-approval proceedings); Pet'rs Br. 56-57.

FDA incorrectly asserts that Petitioners' right to a hearing "hinges" on whether Petitioners are correct about "their burden in seeking to repeal a food-additive authorization." FDA Br. 62-63. Not so. Even if FDA's articulation of Petitioners' burden were correct, FDA arbitrarily concluded that Petitioners did not carry that burden. *See supra* Point II. FDA identifies no "conclusive flaw" in Petitioners' evidence. *Vanda Pharms.*, 150 F.4th at 575 (citation modified). The issues for resolution at a hearing concern the sufficiency of Petitioners' evidence to meet the correct standard.

FDA's bases for denying Petitioners a hearing repeat its Order's erroneous justifications for dismissing Petitioners' cumulative effects, toxicity, and exposure evidence.

First, FDA is incorrect that Petitioners were procedurally barred from challenging FDA's failure to consider the cumulative effects of antiandrogenic phthalates that remain approved. *See supra* Point III.B. FDA offers no other justification for denying a hearing on the disputed factual questions of whether these phthalates are "related" under the Act and pose cumulative risks. [FDA-000012]; FDA Br. 60-61.

Second, FDA asserts that Petitioners' toxicity evidence raises no material factual issues because Petitioners supposedly failed to demonstrate how that evidence proves the Phthalate Additives are unsafe. FDA Br. 61. This rationale fails for the reasons stated *supra* Point III.C, and improperly imposes on Petitioners the burden of prevailing on the ultimate issue as a prerequisite to a hearing. *See Hynson, Westcott & Dunning v. Richardson*, 461 F.2d 215, 220 (4th Cir. 1972), *aff'd sub nom., Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609 (1973).

Third, FDA incorrectly asserts that Petitioners did not present *dietary* exposure evidence. FDA Br. 61-62. As explained *supra* Point III.D, Petitioners presented evidence of unsafe dietary exposures based on biomonitoring data and modeling. FDA's dismissal of that evidence is irrational, and the parties' factual disputes regarding the conclusions the evidence supports justify a hearing. *See Vanda Pharms.*, 150 F.4th at 575-76.

Finally, FDA argues a hearing was not justified because Petitioners' objections did not address moot arguments regarding 23 phthalates that are no longer approved. FDA Br. 63-64. This argument fails for the reasons explained *supra* Point III.B.

In sum, because FDA failed to demonstrate that Petitioners' evidence is "conclusively deficient," it unlawfully denied Petitioners a hearing. *Vanda Pharms.*, 150 F.4th at 573 (quotation omitted).

## CONCLUSION

This Court should vacate FDA's unlawful Order and direct FDA to, within 60 days, initiate revocation proceedings or notice a hearing. Pet'rs Br. 60-61.

DATED: October 15, 2025

Respectfully submitted,
*/s/Katherine K. O'Brien*
KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, Maine 04116
(212) 284-8036
kobrien@earthjustice.org

LAKENDRA S. BARAJAS
KELLY E. LESTER
Earthjustice
48 Wall St., Floor 15
New York, New York 10005
(212) 284-8025
(332) 251-0243
lbarajas@earthjustice.org
klester@earthjustice.org

*Counsel for Petitioners*

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 6,499 words, excluding those parts exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

I also certify that this document complies with the typeface requirements of Fed. R. App. 32(a)(5) and type style requirements of Fed. R. App. 32(a)(6) because it has been prepared in a proportionally spaced font using Microsoft Word Times New Roman 14-point font.

/s/Katherine K. O'Brien
KATHERINE K. O'BRIEN

**CERTIFICATE OF SERVICE**

I certify that on October 15, 2025, I electronically filed the foregoing

document and its addendum with the Court's CM/ECF system, which will serve

each party's counsel of record.

*/s/Katherine K. O'Brien*
KATHERINE K. O'BRIEN
